# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BNSF RAILWAY COMPANY,

       Plaintiff,                                CIVIL NO. 06-1076 MCA/LFG

vs.

LAFARGE SOUTHWEST, INC.; STELLA
R. VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; and GREGORY
MARTINEZ and DARLENE COLEMAN,
Personal Representatives of the Estate of
Carol E. Duran,

       Defendants.

========================================

STELLA R. VALENCIA, individually, and as
Personal Representative of the Estate of Robert J.
Valencia, JOHN KELLY VALENCIA, DESIREE
RICHELLE VALENCIA, STEPHANIE ESTELLE
VALENCIA, and LILLIAN S. VALENCIA,

       Counter Claimants/Cross-Claimants/
       Third-Party Plaintiffs,

vs.

BNSF RAILWAY COMPANY, and DARLENE
COLEMAN, Personal Representative of the
Estate of Carol E. Duran,

       Counter-Defendants/Cross-Defendants,

MIKE TAFT, d/b/a Taft Construction;
and EL PASO NATURAL GAS COMPANY

       Third-Party Defendants.

========================================

LAFARGE SOUTHWEST, INC.

       Third-Party Plaintiff/Cross-Plaintiff

vs.

DARLENE COLEMAN, individually, and as Personal
Representative of the Estate of Carol E. Duran; GREG
GUTIERREZ and MATTHEW RAY DURAN, individually,

       Plaintiffs,

vs.

BNSF RAILWAY COMPANY; LAFARGE SOUTHWEST,
INC.; STELLA VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; MIKE TAFT, d/b/a Taft
Construction; and EL PASO NATURAL GAS CO.,

       Defendants.


## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on *BNSF Railway Company's Second Motion for Partial Summary Judgment, That All Claims of Excessive Speed and Defective Equipment are Preempted* ("the Preemption motion") [Doc. 352]; and *BNSF Railway Company's Fifth Motion for Partial Summary Judgment, and Memorandum in Support, Dismissing Negligence Per Se Claims* ("the Negligence *per se* motion") [Doc. 357], both of which were filed August 7, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court  grants in part and denies in part the Preemption motion and grants the Negligence *per se* motion.          .

## I. BACKGROUND

This action arises from a fatal collision between an eastbound freight train operated by Plaintiff BNSF Railway Company (through its engineer, Marlin Ray, and its conductor, Brian Owens) and a dump truck that was being driven by decedent Carol Duran. On November 1, 2006, Ms. Duran, a contractor for Defendant Lafarge Southwest, Inc., was delivering gravel to a construction site adjacent to railroad tracks when, at the direction of her supervisor, Lafarge employee and decedent Robert Valencia, she stopped her truck on a crossing on the tracks in order to speak with him. Both Ms. Duran and Mr. Valencia were killed as a result of the train colliding with Ms. Duran's fully loaded truck. The accident occurred at approximately 7:30 a.m., in sunny conditions. Despite the shining sun, Conductor Owens was wearing the clear-lens safety glasses that BNSF had provided him; he was not, at the time of the accident, wearing tinted sunglasses.

Two days later, on November 3, 2006, BNSF filed a *Complaint for Property Damage* against the estates of Ms. Duran and Mr. Valencia and Lafarge Southwest, Inc., alleging that it sustained property damage in an amount in excess of $75,000 as a proximate result of the negligent acts and omissions of Ms. Duran and Mr. Valencia. [See generally Doc. 1]. On November 16, 2006, BNSF amended its complaint to add a cause of action for negligence *per se* and on January 22, 2007, filed its *Second Amended Complaint for Property Damage*. [Docs. 3, 13].

On November 1, 2007, the Valencia parties[1] filed their *First Amended Counterclaim and Cross Claim and Third Party Complaint*, alleging, *inter alia*, that BNSF was negligent inasmuch as:

(1)     prior to the collision, the train that struck Ms. Duran's truck was traveling at a speed in excess of that allowed by federal regulations;

(2)     neither the train's horn nor its bell was properly activated to warn Ms. Duran and Mr. Valencia of the train's approach;

(3)     if blown, the train's horn was not audible to Ms. Duran and Mr. Valencia;

(4)     the train failed to slow or brake safely despite the existence of a known object on the tracks ahead of it; and

(5)     the train's crew failed to operate the train safely and stop it prior to the collision.

[Doc. 91 at 5-6]. The Valencia parties also allege that BNSF was negligent *per se* in its "violation of applicable Federal Laws and Regulation[s] at the time of the collision." [Id. at 8].

On March 3, 2008, the Duran parties[2] filed their *First Amended Complaint for Wrongful Death*, in which they assert, among other things, that BNSF is liable under the theory of *respondeat superior* for the negligence of Engineer Ray and Conductor Owens,[3] who operated the train in a careless and reckless manner and who failed to:

---

[1] This group of litigants includes the estate of Robert Valencia and individual relatives of Mr. Valencia and is referred to here as "the Valencia parties."

[2] This group of litigants includes the estate of Carol Duran and individual relatives of Ms. Duran and is referred to here as "the Duran parties."

[3] By *Order* entered September 17, 2007, Engineer Ray and Conductor Owens were dismissed without prejudice. [See Doc. 71].

(1)     "be reasonable" in their operation of the train under the circumstances;

(2)     maintain a safe and reasonable speed;

(3)     have the train under proper control;

(4)     focus on the tracks ahead and keep a proper lookout for pedestrians or vehicles on the crossing;

(5)     use due care;

(6)     slow or brake despite a clear and unobstructed view of Ms. Duran's truck;

(7)     warn Ms. Duran of the impending collision by adequately sounding the train's horn and bell; and

(8)     stop the train before the collision.

[Doc. 160 at 7].  The Duran parties also maintain that BNSF was negligent *per se* because at the time of the collision it was in violation of "safety requirements established by federal and state statutes, regulations, rules, and other requirements." [Id. at 8].

## II. ANALYSIS

### A.     Standard of Review: Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element

of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B.   *BNSF Railway Company's Second Motion for Partial Summary Judgment, That All Claims of Excessive Speed and Defective Equipment are Preempted* [Doc. 352]

In this motion, BNSF argues that the Federal Railroad Safety Act ("FRSA") preempts any claims the Duran and Valencia parties may have asserted that BNSF was negligent because its train was (1) traveling at an excessive speed, and (2) improperly equipped with a defective sun visor. [Doc. 352 at 2].  In a response in which the Valencia parties and Lafarge join, the Duran parties contend that the claims in question come within an exception to the rule of FRSA preemption. [See generally Docs. 413, 421, and 422].

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.  In addition

to preemption occurring as a result of action taken by Congress itself, "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." Louisiana Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 369 (1986).

Congress passed the FRSA in 1970 to "promote safety in every area of rail operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA grants the Secretary of Transportation ("the Secretary") broad authority to "prescribe regulations and issue orders for every area of railroad safety. . . . " 49 U.S.C. § 20103(a). The FRSA also contains an express preemption provision that displaces a state's authority to regulate railroad safety when the Secretary "prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106. Still,

> [a] State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—
>
> > (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
> >
> > (B) is not incompatible with a law, regulation, or order of the United States Government; and
> >
> > (C) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

On August 3, 2007, however, in response to the inequitable result that obtained when two federal courts[4] concluded that state-law negligence claims were preempted by the FRSA

---

[4] Both Lundeen v. Canadian Pac. Ry. Co., 507 F.Supp.2d 1006 (D.Minn. 2007) and Mehl v. Canadian Pac. Ry., Ltd., 417 F.Supp.2d 1104 (D.N.D. 2006) arose from a train

even though the defendant railroad failed to comply with applicable federal regulations,

Congress enacted subsection (b), which provides as follows:

> (b) Clarification regarding State law causes of action.
>
> (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property alleging that a party—
>
> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;
>
> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>
> (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).
>
> (2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

49 U.S.C. § 20106(b).

---

derailment that occurred on January 18, 2002 near Minot, North Dakota. Several damaged tanker cars released anhydrous ammonia into the air, causing personal injury and property damage. The plaintiffs alleged that the derailment occurred when a section of the continuous-welded rail track failed. Their state-law negligence claims were based upon the railroad's failure to (1) inspect and maintain the rail; (2) train its track inspectors; and (3) operate the train properly. The courts in both cases concluded that the FRSA preempted any state law claim, even where the plaintiffs alleged that the railroad failed to comply with federal regulations. Recognizing that the "unduly harsh" consequence of its decision was that the plaintiffs were left "with essentially no remedy[,]", the court in <u>Mehl</u> called on Congress to take action to address this "unfair and inequitable result." <u>Mehl</u>, 417 F.Supp.2d at 1120-21.

In enacting subsection (b), Congress intended only to clarify the existing provision set forth at 49 U.S.C. § 20106 and explained in a House Report that "the restructuring [was] not intended to indicate any substantive change in the meaning of the provision." H.R. REP. NO. 110-259, at 351 (2007). Moreover, that "the amendment is labeled as a 'clarification' . . . indicates Congress sought to resolve an ambiguity rather than effect a substantive change." Henning v. Union Pac. R. Co., 530 F.3d 1206, 1216 (10th Cir. 2008).

In this case, BNSF seeks entry of partial summary judgment in its favor to the extent that (1) the FRSA preempts the Duran and Valencia parties' claims that "BNSF was negligent because its train was allegedly traveling at an excessive speed[,]" and (2) the Locomotive Inspection Act, 49 U.S.C. § 20701 *et. seq.* ("LIA")[5] preempts their claim that "BNSF failed to provide proper equipment—namely, a sun visor—on its locomotive." [Doc. 352 at 2]. The Court, however, does not believe that BNSF accurately restates the Duran and Valencia parties' contentions.

## 1.   **Defective Equipment**

Taking the allegations, as restated, in reverse order, the Court first notes that, with the exception of one instance when, during his deposition, Charles Culver, an expert witness for the Valencia parties,[6] paraphrased BNSF Conductor Owens as having "testi[fied] that his sun

---

[5] The LIA was formerly known as the Boiler Inspection Act, 45 U.S.C. § 22-34. See Matson v. Burlington Northern Santa Fe R.R., 240 F.3d 1233, 1234 (10th Cir. 2001).

[6] Charles Culver is a railroad operations consultant who, according to his affidavit, "was retained as an expert witness in this case to review the actions of this train crew in this incident and to . . . determine whether BNSF and its train crew violated the General Code of Operating Rules (GCOR) and BNSF Train Handling Practices and Safety Rules" at the time of the collision

visor was not working properly to shade his eyes[,]"[7] neither the Duran nor the Valencia parties have asserted that BNSF failed to equip the train in question with a proper or adequate sun visor.[8] Instead, they maintain that BNSF was negligent in providing Conductor Owens with *clear-lens eyeglasses* when he should have been provided *tinted sunglasses* to block the sun glare he allegedly encountered the day of the accident. [See Doc. 413 at 24-25].[9]

The Duran and Valencia parties' sunglasses claim cannot be preempted by the LIA if it does not come within the scope of the LIA. Citing <u>Lunsford</u>, the Tenth Circuit has held that "a carrier cannot be held liable under the BIA for failure to install equipment on a locomotive unless the omitted equipment (1) is required by federal regulations of the Secretary, or (2) constitutes an integral or essential part of a completed locomotive." <u>King</u>

_____

giving rise to this litigation. [<u>See</u> Doc. 429, Affidavit of Charles Culver].

[7] This does not even appear to be an accurate paraphrasing of Conductor Owens' testimony who, when questioned as to whether his visor was effective at the time of the collision, responded, "A little." [Doc. 413; Exh. 3, Owens depo. at 60].

[8] A claim that the sun visor was defective would most likely be preempted under the LIA, which regulates "the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." <u>Napier v. Atl. Coast Line R. Co.</u>, 272 U.S. 605, 611 (1926). "Appurtenances" include "[w]hatever in fact is an integral or essential part of a completed locomotive, and all parts or attachments definitely prescribed by lawful order [of the Secretary]. . . ." <u>Southern Ry. Co. v. Lunsford</u>, 297 U.S. 398, 402 (1936). An attached sun visor would probably properly be considered a part or appurtenance. <u>See</u>, *e.g.*, <u>Coffey v. Northeast Illinois Reg'l Commuter R.R. Corp.</u>, 2006 WL 951964 (N.D.Ill. 2006), *affd.*, 479 F.3d 472 (7th Cir. 2007) (discussing sun visor).

However, because the Court does not understand either the Duran or the Valencia parties to be claiming that the sun visor was defective, the Court need not definitively determine whether such a claim would be preempted.

[9] <u>See also</u> Doc. 413 at 5 ("The true nature of the Duran Parties' claim [is] that the sunglasses were defective. . . .").

v. S. Pac. Transp. Co., 855 F.2d 1485, 1488 (10th Cir. 1988).  Even assuming that sunglasses

somehow constitute "install[able] equipment,"[10] there has been no showing in this case that

sunglasses were either (1) required by federal regulations, or (2) an integral or essential part

of a completed locomotive.  See id.  Consequently, the claims of the Duran and Valencia

parties that BNSF was negligent for its failure to provide Conductor Owens with tinted

sunglasses does not come within the scope of the LIA and, therefore, is not preempted by the

LIA.

### 2.    Excessive Speed

Pursuant to 49 C.F.R. § 213.9, the Federal Railroad Administration sets out maximum

allowable speed limits for different classes of tracks.  In this case, there is no dispute that, at

the time of the collision, the track section at which BNSF's train struck Carol Duran's truck

was rated as Class 5.  The maximum allowable operating speed for a freight train on a Class

5 track is 80 miles per hour.  49 C.F.R. § 213.9.  The parties do not dispute this fact.  Nor do

they dispute that immediately prior to the collision, the train was traveling at approximately

64 to 65 miles per hour, or that it should have been moving more slowly. [See Doc. 413 at

7-8].  Thus, if the Duran and Valencia parties were arguing merely that  BNSF was negligent

because its train was traveling at an excessive speed under the particular circumstances, such

a claim would be preempted by the FRSA.  See CSX Transp., Inc. v. Easterwood, 507 U.S.

_____

[10]  See Varney v. Norfolk and W. Ry. Co., 899 F.Supp. 280, 282 (S.D.W.Va. 1995)
(holding as matter of law that when train's radio was detached from its casing and in transit to
another locomotive, it was no longer a part or appurtenance of the locomotive for purposes of
liability under the Boiler Inspection Act).

658, 673 (1993) (claim that railroad breached common-law duty to operate train at moderate and safe rate of speed preempted where train traveling within maximum speed for which its track was rated).  Again, however, the Court does not understand the Duran and Valencia parties to contend that the speed of the train was excessive, thus creating negligence liability on the part of BNSF.

Instead, the Duran and Valencia parties consistently and repeatedly contend that Ms. Duran's truck "posed a specific, individualized hazard, and the train crew had a tort law duty to recognize the hazard and to get their train under control to avoid this hazard." [Doc. 413 at 7-9, ¶¶ 5-9].  Notwithstanding its holding that the FRSA preempts general negligence claims of excessive speed, the Supreme Court in Easterwood did not address the FRSA's preemptive effect on claims "for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." Easterwood, 507 U.S. at 675 n.15.

As the term is used in 49 U.S.C. § 20106(1), an "essentially local safety hazard" is one that is not adequately encompassed within national uniform standards. Union Pac. R. Co. v. California Pub. Utils. Comm'n, 346 F.3d 851, 860 (9th Cir. 2003); see also Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio, 926 F.2d 567, 571 (6th Cir. 1991) (defining "essentially local railroad safety hazards" as those situations "not capable of being adequately encompassed within uniform national standards"); and Armijo v. Atchison, Topeka & Santa Fe Ry., Co., 754 F.Supp. 1526, 1532 (D.N.M. 1990), rev'd on other grounds, 19 F.3d 547 (10th Cir.), on reh'g, 27 F.3d 481 (10th Cir. 1994).

"[C]ourts considering this issue have ruled that a 'specific individual hazard'[11] must be a discrete and truly local hazard, such as a child standing on the railway." O'Bannon v. Union Pac. R. Co., 960 F.Supp. 1411, 1420 (W.D.Mo. 1997) (citing Bashir v. Nat'l R.R. Passenger Corp. (Amtrak), 929 F.Supp. 404, 412 (S.D.Fla.1996)). Such hazards "must be aberrations which the Secretary could not have practically considered when determining train speed limits under the FRSA." O'Bannon, 960 F.Supp at 1420. To define the term otherwise (i.e., more expansively) would, among other things, "significantly undermine the Secretary's ability to prescribe uniform operational speeds." Id. at 1420-21.

Consequently, and as a general rule,[12] the "essentially local safety hazard" exception will not apply in situations involving (1) an area with a steep grade and a sharp curve, Union Pac. R. Co., 346 F.3d 851; (2) a crossing with a high rate of pedestrian fatalities, Murrell v.

---

[11] In Baker v. Canadian Nat.l/Illinois Cent. Railway Co., the United States District Court for the Southern District of Mississippi noted that some courts treat the "essentially local safety hazard" exception in 49 U.S.C. § 20106 and the "specific individual hazard" exception in Easterwood as synonymous and use the terms interchangeably, while others view the exceptions as distinct. This Court agrees with the Baker court that

> the Supreme Court's reference to an exception for specific, individual hazards clarified that in addition to, or as a facet of a state's right to regulate as to essentially local safety hazards, federal regulations do not diminish the train crew's duty to exercise reasonable care to slow or stop the train to avoid an imminent collision.

Baker v. Canadian Nat.l/Illinois Cent. Railway Co. 397 F.Supp.2d 803, 813 n.7 (S.D. Miss. 2005).

[12] As with any general rule, exceptions exist. For a listing of cases addressing some of these exceptions, see Barbara J. Van Arsdale, Annotation, Construction and Application of "Essentially Local Safety or Security Hazard," Within Meaning of Savings Clause of Federal Railroad Safety Act, 49 U.S.C.A. §§ 20101 et seq., 196 A.L.R. FED. 295 (2004).

13

Union Pac. R. Co., 544 F. Supp. 2d 1138 (D. Or. 2008); (3) conditions limiting a motorist's ability to see oncoming trains, Macfarlane v. Canadian Pac. Ry. Co., 278 F.3d 54 (2d Cir. 2002); or (4) weather conditions such as snow, Cox v. Norfolk and W. Ry. Co., 998 F. Supp. 679 (S.D.W.Va. 1998), or heavy rain, Seyler v. Burlington N. Santa Fe Corp., 102 F. Supp. 2d 1226 (D.Kan. 2000)).

On the other hand, an "obvious case of an individual hazard [is] an engineer who sees a motorist stranded on the crossing, but nevertheless negligently fails to stop or slow his train to avoid the collision." Herriman v. Conrail Inc., 883 F.Supp. 303, 307 (N.D.Ind. 1995). To be sure, "[a] 'specific, individual hazard' applies to a situation where a . . . car *is already on the tracks* and the engineer must slacken speed and try to stop." Largo v. Atchison, Topeka and Santa Fe Ry. Co., 41 P.3d 347, 355 (N.M.App. 2001) (emphasis added). Certainly, "[u]pon realizing that a car, pedestrian, or other obstruction is unable to extricate itself from an impending collision with [an] on-coming train, the operator has a common law tort duty to slow or stop a train to avoid a collision." Shaup v. Frederickson, 1998 WL 726650, at *11 (E.D.Pa. 1998) (unpublished opinion); see also Gillenwater v. Burlington N. and Santa Fe Ry. Co., 481 F.Supp.2d 998, 1003 (E.D.Mo. 2007) (specific, individual hazard includes vehicle's "unwavering approach . . . and the imminent danger of [a] train colliding with [it].").

In a case similar in many respects to the instant matter, a dump truck driver working for a contractor that had been hired by the railroad to remove vegetation and dirt located near a track crossing sued the railroad for negligence after his eastbound truck entered the

crossing and was struck by a northbound train.  <u>Baker v. Canadian Nat.l/Illinois Cent. Ry.</u>
<u>Co.</u>, 397 F.Supp.2d 803, 807 (S.D.Miss. 2005).  Among other things, the injured dump truck
driver argued that the railroad was liable for its train crew's (1) failure to maintain a proper
lookout, and (2) operating the train at an excessive rate of speed under the circumstances.
He contended that the excessive-speed claim came within the FRSA's savings clause, as

> the work of [his] crew at the . . . crossing fit[] the definition of
> a specific, individual hazard, because in setting applicable speed
> limits, federal regulators obviously did not account[ ] for the
> possibility of a two-day construction job involving truck-drivers
> repeatedly driving across a crossing to dump vegetation and
> other debris removed from near the adjacent railroad track when
> they established the track classification.

<u>Id.</u> at 813.  The court disagreed, concluding that "the mere fact of workers in proximity to
. . . tracks whose work requires them to frequently traverse a public crossing in dump trucks
cannot reasonably be said to be a specific individual hazard as contemplated by <u>Easterwood</u>."
<u>Id.</u> at 814.

Despite certain clear similarities between <u>Baker</u> and the instant case, there is at least
one highly significant difference.  In <u>Baker</u>, the injured truck driver "effectively conceded"
the railroad's summary-judgment motion with respect to his claim of failure to maintain a
proper lookout, in support of which the train engineer had provided an affidavit in which he
swore that, prior to the collision, he "maintained a constant lookout in front of the train as
it approached the crossing and that he did see plaintiff's dump truck as it approached the
crossing, *but that he expected it to stop at the stop sign and yield to the approaching train*

as required by Mississippi law."[13]  Baker, 397 F.Supp.2d at 811 (emphasis added).  By

contrast, in this case, both Engineer Ray and Conductor Owens testified that they were

approximately one-quarter of a mile away from the crossing when they realized that there

was a truck on the train tracks.[14]  Critically, however, both Engineer Ray and Conductor

---

[13]  The law to which the Baker court was referring is § 77-9-249 of the Mississippi Code,
which governs vehicles approaching railroad crossings and provides, in pertinent part, that
"[w]henever any person driving a vehicle approaches a railroad grade crossing . . . the driver of
such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest
rail of such railroad, and shall not proceed until he can do so safely."  MISS. CODE ANN. § 77-9-
249(1) (2008).

        In New Mexico,

                [a] person driving a vehicle approaching a railroad-highway grade
                crossing shall:

                (1) obey traffic control devices, crossing gates or barriers or the
                directions of an enforcement official at the crossing;
                (2) stop not more than fifty feet and not less than fifteen feet from
                the nearest rail of a crossing if:
                (a) a train is moving through or blocking the crossing;
                (b) a train is plainly visible and approaching the crossing within
                hazardous proximity to the crossing;
                (c) the sound of a train's warning signal can be heard; or
                (d) a traffic control device, crossing gate, barrier or light or an
                enforcement official signals the driver to stop; and
                (3) proceed through the railroad-highway grade crossing only if it
                is safe to completely pass through the entire railroad-highway
                grade crossing without stopping.

N.M. Stat. Ann. § 66-7-341; see also Largo, 41 P.3d at 355 ("An engineer does not have to
slacken speed or throw the train into emergency stop every time he wonders whether an
approaching vehicle will stop.").

        [14]  Both Engineer Ray and Conductor Owens testified through their depositions that they
were right around the area of the whistle board (a sign with a black "W" for whistle activation)
when they saw the dump truck. [See Doc. 413; Exh. 2, Ray depo. at 87 (when asked where in
relation to the whistle board the train was when he first saw something in the crossing, Engineer
Ray replied, "Right past the whistle board . . . around the whistle board. . . .") and Exh. 3, Owens
depo. at 59 (when asked the same question, Conductor Owens replied, "Before the whistle

Owens believed that the truck *had been abandoned*.  Through his deposition, Engineer Ray

testified as follows:

> Q:   Okay. When you saw—what did you see at the crossing?
> A:   At first it was kind of a—it didn't look like a truck. Because of the way it was, it was dark.  And then we realized it was a truck.  I mean, it was a dark-colored vehicle.  It was black and blue.  It was dark.
> Q:   Was the truck moving or was it—
> A:   No.
> Q:   —sitting still?
> A:   It was—it was stopped.
> Q;   *Was the truck totally blocking the crossing?*
> A:   *Yes, sir.*
> Q:   Was the trailer on one side and the tractor on the other side?
> A:   As far as I remember, the tractor cab part was pretty much on—not off the crossing, but it covered the biggest part of the crossing, and I would say the rear of the truck, the tandem probably the axles might not have been quite on the crossing.
> Q:   How about the front wheels of the tractor?
> A:   I don't—I couldn't tell you exactly.  I just don't know it was there in the crossing.
> Q:   *Where was the cab of the truck, of the tractor?*
> A:   *Just right in the middle of [the] crossing, the way I looked at it.*
> Q:   *And the truck was completely stopped?*
> A:   *Completely stopped.*
> Q:   *Was there anybody inside the cab?*
> A:   *I remember looking through window to window.  I didn't see no movement, no bodies, no arms, nobody moving, nothing.  We didn't see nothing.  That's what scared me. At first I thought somebody abandoned the thing.  That's what it looked like to me.*
> Q:   So the tractor was already beyond the stop sign, completely stopped on the track—

board.").  The whistle board was located 1,320 feet ahead of the crossing where the collision occurred.

A:     Yes, sir.

Q;     —when you saw it?  And it appeared to you that that truck, tractor-trailer, had been stopped there and abandoned?

A:     That's my first thought.

Q:     Was there anything that was obstructing your visibility?

A:     No.

[Doc. 413; Exh. 2, Ray depo. at 87-89 (emphasis added)].

Conductor Owens similarly described his observation of Ms. Duran's truck:

Q:     Okay.  Describe what you have seen.

. . .

A:     I seen a blue truck , and I said, "Oh shit."

. . .

Q:     *Did you say anything further to the engineer?*

A:     *I told him that no one was in the vehicle.*

Q:     *Were you able to clearly see the vehicle at that point?*

A:     *Yes.*

Q:     *And how could you tell there was no one in the vehicle?*

A:     *Because I can see straight through the windows.*

Q:     Did you see anything else in the vicinity?

A:     No.

Q:     Were there any other vehicles, trucks, cars, or people?

A:     No.

Q:     Did you ever see any trucks, cars, or people before impact?

A:     No.

Q:     *Did you ever see anyone in the tractor, in the cab of the tractor?*

A:     *No.*

[Doc. 413; Exh. 3, Owens depo. at 58-61 (emphasis added)].

Thus, both Engineer Ray and Conductor Owens believed that Ms. Duran's truck, which Engineer Ray described as having been "completely stopped . . . right in the middle of the crossing" had been abandoned.  Engineer Ray further testified that within "a matter

18

of seconds" of first seeing Ms. Duran's truck, he "told [Conductor] Owens, 'Man, you better get down. I think we're going to hit[.]'" [Doc. 413; Exh. 2, Ray depo. at 86]. It is difficult to imagine how a collision between an *apparently abandoned* dump truck sitting on a railroad crossing and a freight train approaching that crossing at a speed of 64-65 miles per hour just one-quarter of a mile away could be anything but imminent. The circumstances of this case therefore distinguish it from <u>Baker</u> and place it squarely in line with <u>Herriman</u>, <u>Shaup</u>, <u>Largo</u>, and <u>Gillenwater</u>, all of which contemplate the existence of a specific, individual hazard (*i.e.*, a vehicle on train tracks) where a collision is inevitable. Accordingly, the Court concludes that the presence of Ms. Duran's truck on the track crossing under the unique circumstances presented here constitutes a "specific, individual hazard," and that claims asserting BNSF's negligence liability for the consequences of the collision between that truck and its train are not expressly preempted by the FRSA. <u>See</u> <u>Easterwood</u>, 507 U.S. at 675 n. 15 (declining to address FRSA's preemptive effect on such excessive-speed related claims as breach of "duty to slow or stop a train to avoid a specific, individual hazard").

### 3.   Failure to Comply with BNSF's Own Standards

Subsection (b) of 49 U.S.C. § 20106 exempts from preemption "an action under State law seeking damages for personal injury, death, or property alleging that a party . . . has failed to comply with its *own plan, rule, or standard* that it created pursuant to a regulation or order issued by either of the Secretaries [Transportation and Homeland Security]. . . ." 49 U.S.C. § 20106(b)(1)(B) (emphasis added). The Duran and Valencia parties contend that "the BNSF crew violated [several] BNSF Rules and Regulations[, which] are all related to

the speed of the train in this particular incident and the lack of emergency brake application [and] are not preempted under the new § 20106(b)(1)(B)." [Doc. 413 at 20].

According to the Duran and Valencia parties, "BNSF has adopted the General Code of Operating Rules (GCOR) as the codification of the standard of conduct their employees are expected to meet[, and t]he new § 20106(b)(1)(B) allows common law claims based on the allegation that a railroad has failed to follow its own operating rules. . . ." [Doc. 413 at 19].  In addition to maintaining that BNSF violated GCOR 1.1.1[15] and GCOR 1.1.2,[16] the Duran and Valencia parties contend that BNSF violated Air Brake and Train Handling Rule 103.8.2.[17]  The Duran and Valencia parties, however, have presented no evidence tending to show that the rules set forth in the GCOR or in BNSF's Air Brake and Train Handling Rules constitute "rule[s] or standard[s] that [BNSF] *created pursuant to a regulation or order issued by [the Secretary of Transportation]*," 49 U.S.C. § 20106(b)(1)(B) (emphasis added), and the Court's own research similarly has revealed no authority that would support the Duran and Valencia parties' position.  To the contrary, courts have variously described the

---

[15]  This rule is titled "Maintaining a Safe Course" and states: "In case of doubt or uncertainty, take the safe course." [See Doc. 413; Exh. 5, "General Code of Operating Rules (5th ed., April 3, 2005)].

[16]  This rule is titled "Alert and Attentive" and states: "Employees must be careful to prevent injuring themselves or others.  They must be alert and attentive when performing their duties and plan their work to avoid injury."  [See id.].

[17]  This rule is titled "Emergency Brake Application by Crew Member" and states, in pertinent part: "A crew member must initiate an emergency brake application, without hesitation, when . . . [l]ife or property is in danger."  [See Doc. 413; Exh. 6, "Air Brake and Train Handling Rules" (No. 3, July 13, 2003)].

GCOR as "a set of model procedures to which railroads . . . subscribe[,]"[18] "a railroad's . . . private practices[,]"[19] "rules governing train movement," [20] and "a set of rules and requirements for operating trains."[21]  In not one of the cases that this Court has located where the GCOR is discussed does the issuing court state or even suggest that the GCOR was created pursuant to a regulation or order issued by the Secretary of Transportation.[22] However, to bring their claims within the protections of 49 U.S.C. § 20106(b)(1)(B) and escape preemption, the Duran and Valencia parties must demonstrate that the GCOR and BNSF's Air Brake and Train Handling Rules were created pursuant to a regulation or order issued by the Secretary of Transportation.  Because they have not made that showing, the Court is constrained to hold that the Duran and Valencia parties' negligence claims—to the extent they are based on BNSF's alleged failure to comply with the GCOR and its Air Brake and Train Handling Rules—are preempted by the FRSA.

---

[18]  Ass'n of Am. R.R. v. Dep't of Transp., 198 F.3d 944, 949 (D.C. Cir. 1999).

[19]  Magelky v. BNSF Ry. Co., 2008 WL 281778, at *5 (D.N.D. Jan. 29, 2008) (unpublished opinion).

[20]  Johnson v. Union Pac. R. Co., 2007 WL 2790699, at *4 (D.Neb. Sept. 24, 2007) (unpublished opinion).

[21]  Wade v. Nat'l R.R. Passenger Corp., 2003 WL 22872111, at *1 n.1 (N.D.Ill. Dec. 3, 2003) (unpublished opinion).

[22]  Nor does *Compliance with Railroad Operating Rules and Corporate Culture Influences*, a document published by the Federal Railroad Administration, indicate that the GCOR was created pursuant to a regulation or order issued by the Secretary of Transportation. Instead, that document explains that the GCOR is one of two standard rulebooks used by American railroads since the 1887 adoption by railroad representatives of what is now known as the Standard Code of Operating Rules.  See *Compliance with Railroad Operating Rules and Corporate Culture Influences, ¶¶* 1.2 and 1.3 (1999), www.fra.dot.gov/downloads/Research/ord9909.pdf - 2003-09-08.

**C.**   ***BNSF Railway Company's Fifth Motion for Partial Summary Judgment, and Memorandum in Support, Dismissing Negligence Per Se Claims* [Doc. 357]**

In this motion, BNSF moves for summary judgment with respect to the Duran and Valencia parties' claims that BNSF's conduct constituted negligence *per se*, arguing that the Duran and Valencia parties have failed to identify any applicable governmental statute or regulation that BNSF has allegedly violated. [Docs. 357, 480].  In response, the Duran and Valencia parties[23] maintain, again, that BNSF violated GCOR 1.1.1; GCOR 1.1.2; GCOR 5.8.2(7) (relating to the sounding of the train's whistle); Air Brake and Train Handling Rule 103.8.2; and 49 C.F.R. § 234.105(d) (a regulation addressing "activation failures"). [Doc. 416].

The doctrine of negligence *per se* holds that "[a]n actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect."  RESTATEMENT (THIRD) OF TORTS § 14 (Tentative Draft No. 1, 2001). This doctrine allows

> [a] court [to] adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
> > (a) to protect a class of persons which includes the one whose interest is invaded, and
> > (b) to protect the particular interest which is invaded, and

---

[23] The Duran parties filed a response in which the Valencia parties and Lafarge join. [See Docs. 421 and 422].

>           (c) to protect that interest against the kind of harm
>           which has resulted, and
>           (d) to protect that interest against the particular
>           hazard from which the harm results.

RESTATEMENT (SECOND) OF TORTS § 286 (1965).

The New Mexico Supreme Court applies the following four-part test to determine whether an actor's conduct amounts to negligence *per se*: (1) there must be a statute that prescribes certain actions or defines a standard of conduct, either explicitly or implicitly; (2) the defendant must violate the statute; (3) the plaintiff must be in the class of persons sought to be protected by the statute; and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent.  Heath v. La Mariana Apartments, 180 P.3d 664, 666 (N.M. 2008) (*quoting* Archibeque v. Homrich, 543 P.2d 820, 825 (1975)).  "In negligence per se cases, [the Court] must ask whether the policy behind the legislative enactment will be appropriately served by using the policy to impose and measure civil damage liability."  Pehle v. Farm Bureau Life Ins. Co., Inc., 397 F.3d 897, 904 (10th Cir. 2005).

As an initial matter and for the reasons set forth more fully in Section II.3.B. above, the Court has already determined that the FRSA preempts any state law claims asserted by the Duran and Valencia parties that are based upon BNSF's alleged failure to comply with its own plans, rules, or standards. See 49 U.S.C. § 20106(b)(1)(B).  Thus, to the extent that the Duran and Valencia parties assert (or merely reassert) that BNSF was negligent *per se* as a result of its failure to comply with GCOR 1.1.1; GCOR 1.1.2; GCOR 5.8.2(7); and Air

Brake and Train Handling Rule 103.8.2, those claims are preempted.

In the alternative, any violation of the GCOR or the Air Brake and Train Handling Rules would not constitute negligence *per se.* As previously explained, the GCOR and the Air Brake and Train Handling Rules are best described as internal operating rules.[24] Internal operating rules are not to be treated "'as legal standards of duty, but as evidence of the measure of caution which ought to be exercised in situations to which the rules apply.'" Robinson v. Missouri Pacific R. Co., 16 F.3d 1083, 1091 (10th Cir. 1994) (*quoting* Fulton v. St. Louis-San Francisco Ry., 675 F.2d 1130, 1133 (10th Cir.1982)). Indeed, courts that have considered the issue have concluded that a violation of the rules set forth in the GCOR does not constitute negligence *per se.* Schipper v. BNSF Ry. Co., 2008 WL 2783160, at *11 (D.Kan. 2008) (unpublished opinion) (in action brought pursuant to Federal Employer's Liability Act ("FELA"), "find[ing] no support for the argument that a violation of internal safety procedures themselves constitutes negligence per se in the F.E.L.A. context[,]" and distinguishing internal safety rules from statutes and regulations, the violation of which *will* amount to negligence *per se*) see also Magelky, 2008 WL 281778, at *5 (excluding expert testimony that BNSF's GCOR establishes a legal standard of care, since a "railroad's duty of due care is governed by law and not by its private practices"); and Ard v. Metro-North R.R. Co., 492 F.Supp.2d 95, 99 (D.Conn. 2007) (explaining that commuter train line's safety and operating rules do not constitute legal standards or necessarily establish the applicable legal standard, though they may be considered as some evidence of what may be reasonable

---

[24] See supra notes 18-21.

in a given situation).

The final argument of the Duran and Valencia parties is that BNSF was negligent *per se* because at the time of the accident Engineer Ray and Conductor Owens were in violation of 49 C.F.R. § 234.105(d).  Part 234 of the Code of Federal Regulations covers grade crossing signal system safety, and § 234.105 provides, in full, as follows:

> **§ 234.105 Activation failure.**
>
> Upon receipt of a credible report of warning system malfunction involving an activation failure, a railroad having maintenance responsibility for the warning system shall promptly initiate efforts to warn highway users and railroad employees at the subject crossing by taking the following actions:
>
> (a) Prior to any train's arrival at the crossing, notify the train crew of the report of activation failure and notify any other railroads operating over the crossing;
>
> (b) Notify the law enforcement agency having jurisdiction over the crossing, or railroad police capable of responding and controlling vehicular traffic; and
>
> (c) Provide for alternative means of actively warning highway users of approaching trains, consistent with the following requirements (see Appendix B for a summary chart of alternative means of warning):
>
>> (1)(I) If an appropriately equipped flagger provides warning for each direction of highway traffic, trains may proceed through the crossing at normal speed.
>>
>> (ii) If at least one uniformed law enforcement officer (including a railroad police officer) provides warning to highway traffic at the crossing, trains may proceed through the crossing at normal speed.

(2) If an appropriately equipped flagger provides warning for highway traffic, but there is not at least one flagger providing warning for each direction of highway traffic, trains may proceed with caution through the crossing at a speed not exceeding 15 miles per hour. Normal speed may be resumed after the locomotive has passed through the crossing.

(3) If there is not an appropriately equipped flagger or uniformed law enforcement officer providing warning to highway traffic at the crossing, each train must stop before entering the crossing and permit a crewmember to dismount to flag highway traffic to a stop. The locomotive may then proceed through the crossing, and the flagging crewmember may reboard the locomotive before the remainder of the train proceeds through the crossing.

(d) A locomotive's audible warning device shall be activated in accordance with railroad rules regarding the approach to a grade crossing.

49 C.F.R. § 234.105.  According to the Duran and Valencia parties, Engineer Ray and Conductor Owens failed to sound the train's horn in a proper manner, which amounted to an activation failure within the meaning of § 234.105(d) and, in turn, constituted negligence *per se*. [Doc. 416 at 11].  The Court does not agree.

The Code of Federal Regulations clearly and expressly states, in pertinent part, that "[a]ctivation failure means the failure of an *active* highway-rail grade crossing warning system to indicate the approach of a train at least 20 seconds prior to the train's arrival at the crossing. . . ."  49 C.F.R. § 234.5 (emphasis added).  Crossings can be equipped with active

or passive warning devices:

> Active [w]arning [d]evices means those traffic control devices
> activated by the approach or presence of a train, such as flashing
> light signals, automatic gates and similar devices, as well as
> manually operated devices and crossing watchmen, all of which
> display to motorists positive warning of the approach or
> presence of a train.

23 C.F.R. § 646.204. By contrast, "[p]assive [w]arning [d]evices means those types of traffic

control devices, including signs, markings and other devices, located at or in advance of

grade crossings to indicate the presence of a crossing but which do not change aspect upon

the approach or presence of a train." Id.

In this case, it is undisputed that Ms. Duran and Mr. Valencia were struck at a

"passive crossing." [See Doc. 91 at 6 ("BNSF failed and refused to install any level of train

activated protection (crossing arms, gates, lights, bells or other devices) at this crossing.")

and Doc. 160 at 6 ("BNSF failed to place adequate safety signals, signs, lights or arm bars

at the crossing.")]. However, an "activation failure" is defined as "the failure of an *active*

highway-rail grade crossing warning system. . . ." 49 C.F.R. § 234.5(emphasis added).

Because Ms. Duran and Mr. Valencia were not struck at a crossing that employed an active

warning system, 49 C.F.R. § 234.105 has no application here. Additionally, § 234.105

applies "[u]pon receipt of a credible report of warning system malfunction involving an

activation failure. . . ." 49 C.F.R. § 234.105; see also Stone v. CSX Transp., Inc., 37

F.Supp.2d 789, 794-495 (S.D.W.Va. 1999) (addressing § 234.107 (false activation) and

explaining that "[i]n order to trigger its required duties under this section, a railroad must first

27

receive a credible report of a false activation.").  In the instant case, even assuming that there

was some sort of malfunctioning warning system, there is no evidence that BNSF received

any sort of report about a malfunction.  Finally, the subsection that the Duran and Valencia

parties isolate and cite in support of their argument that "[i]f you don't sound the horn as

required by the operating rules, this is also an Activation Failure[,]" must be read in the

context of the whole Code section.  Consideration of the entire section makes clear that the

purpose of 49 C.F.R. § 234.105 is to ensure that a train nearing an active crossing that is

experiencing a warning-system malfunction takes certain actions—including, but not limited

to, activating an audible warning device—to alert of its approach.   Because 49 C.F.R.

§ 234.105 has no application here, BNSF is entitled to summary judgment to the extent that

the Duran and Valencia parties contend that BNSF was in violation of that Code section, and

that that violation amounted to negligence *per se.*   See Pehle, 397 F.3d at 904 (directing

courts addressing claims of  negligence *per se* to "ask whether the policy behind the

legislative enactment will be appropriately served by using the policy to impose and measure

civil damage liability.").

## III. CONCLUSION

For the reasons set forth more fully herein, the Court will grant in part and deny in

part *BNSF Railway Company's Second Motion for Partial Summary Judgment, That All

Claims of Excessive Speed and Defective Equipment are Preempted* [Doc. 352].  The Court

will grant *BNSF Railway Company's Fifth Motion for Partial Summary Judgment, and

Memorandum in Support, Dismissing Negligence Per Se Claims* [Doc. 357].

**IT IS, THEREFORE, ORDERED** that *BNSF Railway Company's Second Motion for Partial Summary Judgment, That All Claims of Excessive Speed and Defective Equipment are Preempted* [Doc. 352] is **GRANTED IN PART and DENIED IN PART**;

**IT IS FURTHER ORDERED** that *BNSF Railway Company's Second Motion for Partial Summary Judgment, That All Claims of Excessive Speed and Defective Equipment are Preempted* [Doc. 352] is **GRANTED** to the extent that the claims of negligence that are the subject of this motion are based upon an alleged failure to comply with internal railroad operating rules;

**IT IS FURTHER ORDERED** that *BNSF Railway Company's Second Motion for Partial Summary Judgment, That All Claims of Excessive Speed and Defective Equipment are Preempted* [Doc. 352] is **DENIED** to the extent that the claims of negligence that are the subject of this motion are based upon an alleged failure to act reasonably in the face of the specific, individualized hazard of the presence of Carol Duran's truck on the railroad tracks;

**IT IS FURTHER ORDERED** that *BNSF Railway Company's Second Motion for Partial Summary Judgment, That All Claims of Excessive Speed and Defective Equipment are Preempted* [Doc. 352] is **DENIED** to the extent that the claims of negligence that are the subject of this motion are based upon an alleged failure properly to equip the train crew with tinted sunglasses;

29

**IT IS FURTHER ORDERED** that *BNSF Railway Company's Fifth Motion for Partial Summary Judgment, and Memorandum in Support, Dismissing Negligence Per Se Claims* [Doc. 357] is **GRANTED**.

**SO ORDERED** this 3rd day of November, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge