# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

BNSF RAILWAY COMPANY,

    Plaintiff,                                      CIVIL NO. 06-1076 MCA/LFG

vs.

LAFARGE SOUTHWEST, INC.; STELLA
R. VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; and GREGORY
MARTINEZ and DARLENE COLEMAN,
Personal Representatives of the Estate of
Carol E. Duran,

    Defendants.

=========================================

STELLA R. VALENCIA, individually, and as
Personal Representative of the Estate of Robert J.
Valencia, JOHN KELLY VALENCIA, DESIREE
RICHELLE VALENCIA, STEPHANIE ESTELLE
VALENCIA, and LILLIAN S. VALENCIA,

    Counter Claimants/Cross-Claimants/
    Third-Party Plaintiffs,

vs.

BNSF RAILWAY COMPANY, and DARLENE
COLEMAN, Personal Representative of the
Estate of Carol E. Duran,

    Counter-Defendants/Cross-Defendants,

MIKE TAFT, d/b/a Taft Construction;
and EL PASO NATURAL GAS COMPANY

    Third-Party Defendants.

=========================================

LAFARGE SOUTHWEST, INC.

    Third-Party Plaintiff/Cross-Plaintiff

vs.

DARLENE COLEMAN, individually, and as Personal
Representative of the Estate of Carol E. Duran; GREG
GUTIERREZ and MATTHEW RAY DURAN, individually,

    Plaintiffs,

vs.

BNSF RAILWAY COMPANY; LAFARGE SOUTHWEST,
INC.; STELLA VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; MIKE TAFT, d/b/a Taft
Construction; and EL PASO NATURAL GAS CO.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *BNSF Railway Company's Eighth Motion for Partial Summary Judgment, Dismissing Claimants' Punitive Damages Claims, or in the Alternative, Motion to Bifurcate the Issue of Compensatory Damages and Liability for Punitive Damages* [Doc. 353], filed August 7, 2008. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

**I. BACKGROUND**

This action arises from a fatal collision between an eastbound freight train operated by Plaintiff BNSF Railway Company (through its engineer, Marlin Ray, and its conductor, Brian Owens) and a commercial dump truck that was being driven by decedent Carol Duran. On November 1, 2006, Ms. Duran, a contractor for Defendant/Third-Party Plaintiff Lafarge Southwest, Inc., was delivering gravel to a construction site adjacent to railroad tracks when, at the apparent direction of her supervisor, Lafarge employee and decedent Robert Valencia, she stopped her truck on a crossing on the tracks in order to speak with him. Both Ms. Duran and Mr. Valencia were killed as a result of the train colliding with Ms. Duran's fully loaded truck. The accident occurred at approximately 7:30 a.m., in sunny conditions. Despite the shining sun, Conductor Owens was wearing the clear-lens safety glasses that BNSF had provided him; he was not, at the time of the accident, wearing tinted sunglasses.

Eastbound trains, such as the one involved in this accident, negotiate a series of curves in the final miles leading to the crossing at which Ms. Duran and Mr. Valencia were struck. The last of these curves is a left-hand curve approximately 4,000 feet west of the crossing. There is an escarpment at this final curve, but once the escarpment is passed and the final curve negotiated, the stretch of track between this point (4,000 feet west of the crossing) and the actual crossing is straight, and the view between the two points unobstructed. A whistle board (a sign with a black "W" to alert the train crew to activate the whistle) sits 1,320 (one-quarter of a mile) west of the crossing.

3

It is undisputed that the crew in this matter sounded the train's horn when the train, which was traveling at a speed of approximately 64 to 65 miles per hour, was 1,445 feet west of the crossing, and again when it was 687 feet west of the crossing. At 1,445 feet away from the crossing, the horn was sounded for 4/10 of a second; at 687 feet away, the horn was sounded for one second. It also is undisputed that the crew engaged the train's emergency brakes when the train was 496 feet (the equivalent of five or six seconds) away from the crossing. Finally, it is undisputed that the stopping distance for this train from the point of emergency-brake application until point of rest was 3,429 feet. Approximately 63 seconds elapsed from the time the crew engaged the emergency brakes until the train came to a stop.

On November 3, 2006, BNSF filed a *Complaint for Property Damage* against the estates of Ms. Duran and Mr. Valencia and Lafarge Southwest, Inc., alleging that it sustained property damage in an amount in excess of $75,000 as a proximate result of the negligent acts and omissions of Ms. Duran and Mr. Valencia. [See generally Doc. 1]. On November 16, 2006, BNSF amended its complaint to add a cause of action for negligence *per se* and on January 22, 2007, filed its *Second Amended Complaint for Property Damage*. [Docs. 3, 13].

On February 5, 2007, and February 26, 2007, the Valencia parties[1] and the Duran parties,[2] respectively, filed wrongful-death counterclaim against BNSF, seeking, among other things, the recovery of puitive damages. [See Doc. 91 at 7; Doc. 160 at 12]. BNSF now

---

[1] This group of litigants includes the estate of Robert Valencia and individual relatives of Mr. Valencia and is referred to here as "the Valencia parties."

[2] This group of litigants includes the estate of Carol Duran and individual relatives of Ms. Duran and is referred to here as "the Duran parties."

moves to dismiss the claims for punitive damages or, in the alternative, to bifurcate the issue from the issues of liability and compensatory damages. [See Doc. 358].

## II. ANALYSIS

### Standard of Review: Fed.R.Civ.P. 56

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

Apart from these limitations, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

**A.     *BNSF Railway Company's Eighth Motion for Partial Summary Judgment, Dismissing Claimants' Punitive Damages Claims, or in the Alternative, Motion to Bifurcate the Issue of Compensatory Damages and Liability for Punitive Damages* [Doc. 353]**

Both the Duran and Valencia parties have sought to recover punitive damages on the ground that BNSF's actions were "grossly negligent, reckless, willful, wanton and with malice and in conscious indifference to the great extent of danger and disregard of the life and well being of Robert J. Valencia. . . ." [Doc. 91 at 6], and "grossly negligent, reckless, malicious, willful, and wanton and in conscious indifference to the life and well-being of Carol Duran. . . ." [Doc. 160 at 6]. Through its eighth summary-judgment motion, BNSF seeks dismissal of these claims on the ground that its conduct was not wrongful in the first instance but, even if it was, BNSF did not act with the culpable mental state required to support a claim for punitive damages. Alternatively, BNSF seeks to bifurcate the issue of liability and compensatory damages from the issue of liability for punitive damages. [See generally Doc. 353].

"[P]unitive damages are imposed for the limited purposes of punishing the [wrongdoer] and deterring others from similar conduct. McGinnis v. Honeywell, Inc., 791 P.2d 452, 460 (N.M. 1990). Moreover, "[t]o be liable for punitive damages, a wrongdoer must have some culpable mental state and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level. . . ." Clay v. Ferrellgas, Inc., 881 P.2d 11, 14 (N.M. 1994) (internal citations omitted). Gross negligence is insufficient and, instead,

> [a] mental state sufficient to support an award of punitive damages will exist when the defendant acts with "reckless disregard" for the rights of the plaintiff—i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless "utterly fail[s] to exercise care" to avoid the harm.

Paiz v. State Farm Fire and Cas. Co., 880 P.2d 300, 308 (N.M. 1994) (emphasis in original).

In New Mexico,

> [a] corporation may be held liable for punitive damages for the misconduct of its employees if: (1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages; (2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages; or (3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages.

Chavarria v. Fleetwood Retail Corp., 143 P.3d 717, 725 (N.M. 2006) (internal citations omitted).  Neither the Duran nor the Valencia parties appear to argue that either Marlin Ray or Brian Owens was a managerial employee of BNSF. [See generally Docs. 389, 427]. Instead, the Duran parties contend that Engineer Ray and Conductor Owens acted recklessly, wantonly, and/or willfully with respect to the manner in which they responded to the danger of Carol Duran's truck on the railroad tracks and that, when viewed cumulatively, the crew's actions and inactions reflect a sufficiently culpable corporate mental state to support the assessment of punitive damages against BNSF. [See Doc. 427 at 19-20]. The Valencia parties argue that Engineer Ray and Conductor Owens committed "numerous safety and operating rule violations[,]" which BNSF ratified when it failed to discipline the crew after the accident. [Doc. 389 at 11]. The Valencia parties also assert that BNSF's independent

7

willful and reckless conduct in failing to provide the train crew with tinted sunglasses to help prevent sun glare expose it to liability for punitive damages. [Id.].

It is undisputed that there have been no prior collisions or reported near misses at the crossing in question. [See Doc. 353 at 3]. It also is undisputed that, on the day in question, the crew sounded the train's horn (if just briefly) when the train was 1,445 feet west of the crossing, and then again approximately 687 prior to impact. [See Doc. 427 at 9]. It additionally appears to be undisputed that the train's bells began ringing when the train was 1,445 feet away from the crossing.[3] As Engineer Ray described the moments before the collision, once he realized that there was what appeared to him to be an abandoned truck sitting on the tracks ahead of his train, he and Conductor Owens were reduced to a state of panic, chaos, pandemonium, shock, disbelief, and fear for their lives. This occurred around the area of the whistle board. [See Doc. 353; Exh. 1, Ray depo. at 87 ("Q: In relation to your starting to sound the horn, when did you first see the truck that was struck at the crossing?

---

[3] In its *Statement of Undisputed Material Facts*, BNSF contends that "Engineer Ray sounded the horn at 1,445 feet before the crossing. At the same time, the locomotive's bell started ringing and continued ringing until the train stopped following the collision." [Doc. 353 at 8]. While the Duran parties's *Response* challenges that the horn was sounded appropriately, it does not address BNSF's assertion that the bells also were sounding. [See Doc. 427 at 9]. The Valencia parties rely on the deposition testimony of Gerardo Ortiz when they respond that "[a]ccording to the only witness at the scene of the collision, the BNSF train crew failed to sound the horn (whistle) or any audible warning prior to impact at the crossing." [Doc. 389 at 3]. This mischaracterizes the testimony of Mr. Ortiz, who did not state that the crew failed to sound the horn but, instead, explained that "[he] did not hear" the horn. [Doc. 389; Exh. 1, Ortiz depo. at 68]. Mr. Ortiz further admitted that it was possible that the horn sounded but that he just did not hear it in his northbound truck, with his windows up and two radios on. [Id., Exh. 1, Ortiz depo. at 68, 69]. Mr. Ortiz said nothing about bells. Additionally, Engineer Ray testified that the train's bells were ringing all the way from the whistle board to the point of impact. [Doc. 353; Exh. 1, Ray depo. at 85-86].

A: At the whistle board, somewhere around the area of the whistle board. . . .")]. Within "a matter of seconds" of realizing that a truck was sitting on the tracks ahead of his train, Engineer Ray "slammed [his] emergency brake valve . . . fully, all forward. . . ." After Engineer Ray "slammed everything," he got down on the floor in an attempt to brace himself for impact. [Id.; Exh. 1, Ray depo. at 116].

     As this Court has already ruled, it will be for the jury to determine whether Engineer Ray and/or Conductor Owens were negligent in failing to, among other things, break the train properly and/or sound the horn properly and, if so, whether that negligence was a proximate cause of the collision. [See Doc. 586 at 9-22]. However, where the crew gave warning by sounding the horn and ringing the bells, and applied the emergency brake once it realized that Ms. Duran's truck was not going to move off of the tracks, the Court concludes that no reasonable jury could conclude that Engineer Ray and Conductor Owens acted with a sufficiently culpable mental state to support the imposition of punitive damages. See Morris v. Union Pacific R.R., 373 F.3d 896, 903-904 (8th Cir. 2004) (where evidence showed that train crew made "purposeful efforts to protect persons in the area of the train[,]" substantial evidence did not exist from which reasonable jury could have found that railroad acted wantonly in causing injury or with such conscious indifference to consequences that malice could have been inferred); Anderson v. Chesapeake and Ohio Ry. Co., 498 N.E.2d 586, 591 (Ill.App. 1986) (where state statute mandated sounding of train's whistle 1,320 feet from crossing, crew's sounding of whistle at 1,000 feet from crossing might have amounted to negligence per se, but did not "alone necessarily indicate wilful and wanton conduct.");

Liboy ex rel. Liboy v. Rogero ex rel. Rogero, 363 F.Supp.2d 1332, 1342 (M.D.Fla. 2005).[4,5]

BNSF's motion to dismiss punitive-damages claims will be granted.[6]

---

[4] In Liboy, an automobile passenger was killed when the car in which he was riding was struck by an Amtrak train at a crossing in Florida. Although Florida law provides that "any railroad train approaching within 1,500 feet of a public railroad-highway grade crossing shall emit a signal audible for such distance," the crew involved in the collision did not sound the train's horn until the train was 812 feet from the crossing. Liboy, 363 F.Supp.2d at 1341. The court entered summary judgment for Amtrak and the crew on the plaintiffs' punitive-damages claim, holding that a failure to sound the horn at 1,500 feet from the crossing "could [not] possibly meet [the] standard[]" of culpability required to sustain an award of punitive damages where, among other things, the crossing in question "was not frequently used, nor apparently was it a site of frequent danger[; i]n the 27 years prior to the collision, only one other train-vehicle collision occurred at the Glen Rose Crossing[;] and there [was] no evidence the circumstances were comparable." Id. at 1342.

[5] It should also be noted that neither the Valencia parties nor the Duran parties dispute that "[a]s part of his Federal Railroad Administration Engineer's Certification and employment requirements for BNSF, Engineer Ray attends rule classes and takes biannual rules tests to ensure that he understands and is proficient with [BNSF's] General Code of Operating Rules and the Air Brake Handling Rules." [Doc. 353 at 7]. The New Mexico Court of Appeals has held (in a case where a worker was seriously injured when his foot was caught in a tail pulley on an asphalt recycling plant) that the evidence, which included proof of the defendant/plant manufacturer's integrated safety program, as well as the fact that the defendant's engineers met at least twice a year to discuss safety concerns, did not demonstrate a cavalier safety attitude or a culpable mental state sufficient to support an award of punitive damages, although the defendant "should have done things differently." Couch v. Astec Indus., Inc., 53 P.3d 398, 412 (N.M.App. 2002).

[6] In addition to the imposition of punitive damages on the basis of the crew's actions, the Valencia parties seek the imposition of punitive damages for BNSF's failure to equip the crew with tinted sunglasses. According to the Valencia parties, "BNSF's deliberate conduct in failing to provide tinted safety glasses to its[] crew with knowledge that traveling into the face of the rising sun and that the crew would be operating the freight train blind for some period of time is malicious, willful, reckless and w[a]nton." [Doc. 389 at 11]. Aside from their conclusory statement that such conduct "displays a culpable state of mind and is a sound basis for an award of punitive damages[,]" [id.], the Valencia parties have offered no evidence (for example, that BNSF knew the crossing was a site of frequent danger or that prior accidents had occurred there) tending to demonstrate that BNSF's failure to equip the crew with sunglasses rose to conduct that could be described as "willful, wanton, malicious, reckless, [or] oppressive. . . ." Clay, 881 P.2d at 14.

### III. CONCLUSION

On the basis of the foregoing, the Court will grant *BNSF Railway Company's Eighth Motion for Partial Summary Judgment, Dismissing Claimants' Punitive Damages Claims, or in the Alternative, Motion to Bifurcate the Issue of Compensatory Damages and Liability for Punitive Damages*.

**IT IS, THEREFORE, ORDERED** that *BNSF Railway Company's Eighth Motion for Partial Summary Judgment, Dismissing Claimants' Punitive Damages Claims, or in the Alternative, Motion to Bifurcate the Issue of Compensatory Damages and Liability for Punitive Damages* [Doc. 353] is **GRANTED**.

**SO ORDERED** this 26th day of January, 2009, in Albuquerque, New Mexico.

_____
 **M. CHRISTINA ARMIJO**
 United States District Judge