# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BNSF RAILWAY COMPANY,

      Plaintiff,                                              CIVIL NO. 06-1076 MCA/LFG

vs.

LAFARGE SOUTHWEST, INC.; STELLA
R. VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; and GREGORY
MARTINEZ and DARLENE COLEMAN,
Personal Representatives of the Estate of
Carol E. Duran,

      Defendants.

========================================

STELLA R. VALENCIA, individually, and as
Personal Representative of the Estate of Robert J.
Valencia, JOHN KELLY VALENCIA, DESIREE
RICHELLE VALENCIA, STEPHANIE ESTELLE
VALENCIA, and LILLIAN S. VALENCIA,

      Counter Claimants/Cross-Claimants/
      Third-Party Plaintiffs,

vs.

BNSF RAILWAY COMPANY, and DARLENE
COLEMAN, Personal Representative of the
Estate of Carol E. Duran,

      Counter-Defendants/Cross-Defendants,

MIKE TAFT, d/b/a Taft Construction;
and EL PASO NATURAL GAS COMPANY

      Third-Party Defendants.

========================================

LAFARGE SOUTHWEST, INC.

      Third-Party Plaintiff/Cross-Plaintiff

vs.

DARLENE COLEMAN, individually, and as Personal
Representative of the Estate of Carol E. Duran; GREG
GUTIERREZ and MATTHEW RAY DURAN, individually,

      Plaintiffs,

vs.

BNSF RAILWAY COMPANY; LAFARGE SOUTHWEST,
INC.; STELLA VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; MIKE TAFT, d/b/a Taft
Construction; and EL PASO NATURAL GAS CO.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiff BNSF Railway Company's Sixth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Charles Culver, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 495] filed October 29, 2008. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court will grant the motion.

## I. BACKGROUND

This action arises from a fatal collision between an eastbound freight train operated by Plaintiff  BNSF Railway Company (through its engineer, Marlin Ray, and its conductor,

Brian Owens) and a commercial dump truck that was being driven by decedent Carol Duran. On November 1, 2006, Ms. Duran, a contractor for Defendant/Third-Party Plaintiff Lafarge Southwest, Inc., was delivering gravel to a construction site adjacent to railroad tracks when, at the apparent direction of her supervisor, Lafarge employee and decedent Robert Valencia, she stopped her truck on a crossing on the tracks in order to speak with him.  Both Ms. Duran and Mr. Valencia were killed as a result of the train colliding with Ms. Duran's fully loaded truck.  The accident occurred at approximately 7:30 a.m., in sunny conditions.  Despite the shining sun, however, Conductor Owens was wearing clear-lens safety glasses rather than tinted sunglasses.

Eastbound trains, such as the one involved in this accident, negotiate a series of curves in the final miles leading to the crossing at which Ms. Duran and Mr. Valencia were struck. The last of these curves is a left-hand curve approximately 4,000 feet west of the crossing. There is an escarpment at this final curve, but once the escarpment is passed and the final curve negotiated, the stretch of track between this point (4,000 feet west of the crossing) and the actual crossing is straight, and the view between the two points unobstructed.  A whistle board (a sign with a black "W"  to alert the train crew to activate the whistle) sits 1,320 feet (one-quarter of a mile) west of the crossing.  It is highly contested whether Ms. Duran's truck was already on the crossing at the time the train cleared the escarpment (the Duran parties' position), or whether she came upon the crossing when the train was already past the escarpment and either at or in the area of the whistle board (BNSF's position).

Notwithstanding the dispute over the precise amount of time that Ms. Duran's truck was on the tracks, it is undisputed that the train "was around the whistle board" when the crew "knew there was something at the crossing" and that, within "a matter of seconds" the crew "visualized it was a truck." [Doc. 567; Exh. I, depo. of Marlin Ray at 117].  At that point of emergency, Engineer Ray "slammed [his] dynamic[,] slammed [his] emergency brake valve[,]' and got down on the floor of the cab. [Id.; Exh. I, depo. of Marlin Ray at 115].

On November 1, 2007, the one-year anniversary of the collision, Charles. L. Culver, the Valencia parties' proposed expert witness on railroad operations, visited the scene of the accident.   On the basis of this visit, as well as his review of deposition testimony; photographs of the scene; police and weather reports; BNSF's General Code of Operating Rules; and more, Mr. Culver has formed a number of opinions, which BNSF now seeks to exclude as inadmissible on numerous grounds. [See generally Doc. 495].

## II. ANALYSIS

Rule 702 of the Federal Rules of Evidence imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed.R.Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such

4

determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000).  As part of its gatekeeping function, and in addition to determining whether the proposed expert is qualified to offer an opinion, the Court must also determine whether (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.  Reliability under Daubert is determined by looking at whether the reasoning or methodology underlying the testimony is scientifically valid, and relevance is determined by whether that reasoning or methodology properly can be applied to the facts in issue.  Smith v. Sears Roebuck and Co., 232 Fed.Appx. 780, 781 (10th Cir. 2007).

**1. Mr. Culver's Qualifications**

BNSF seeks to prevent expert testimony from Mr. Culver on the ground that his "lack of qualifications on railroad operations and his lack of candor render his opinions unreliable and inadmissible." [Doc. 495 at 2].

Charles Culver is a railroad operations consultant with expertise in train handling, rules interpretation, event recorder data interpretation, and railroad industry practice.  He is a former certified locomotive engineer who also has qualified through training in the duties of a designated supervisor of locomotive engineers.  He began his career with railroads in 1970, when he went to work as a welder's helper in the engineering department of what was

then the Missouri Pacific Railroad (now Union Pacific).  In 1973, after having worked as a railroad fireman, engineer trainee, and servicing engineer, Mr. Culver was promoted to railroad engineer, a position he held until he left the railroad in 1995.  During his 25 years with the railroad, Mr. Culver also served as a technical training instructor of on-board computer operations, as well as a rules instructor.  [Doc. 529; Exh. B, Culver depo. at 32-33]. While with the railroad, Mr. Culver also provided rules and safety training for newly hired employees. [Doc. 529; Exh. A, Culver C.V. at 2].

Mr. Culver has received technical training through the BNSF Academy of Railroad Sciences on Title 49 of the Code of Federal Regulations (Transportation), and is able to test and evaluate the knowledge and skills of locomotive engineers on this Part.  Mr. Culver similarly has received technical training in Basic Instruction for Brakemen/Switchmen and Derailment Investigation Procedures.  He underwent engineer recertification training in 2008. [Doc. 529; Exh. A, Culver C.V. at 3].

Mr. Culver holds certificates of advanced training in both freight car air brake equipment and locomotive air brake and electro-pneumatic equipment.  Through the Union Pacific Technical Training Department, Mr. Culver has qualified as an instructor in Air Brake Rules and Operation.   [Doc. 529; Exh. A, Culver C.V. at 3].

Mr. Culver has translated the General Code of Operating Rules into Spanish for use by Mexican railroads, and has developed operations/training manuals.  He has published and/or presented on topics such as operating rules and their function in railroad operations, and the evolution of the event recorder.  Mr. Culver is a member of The Air Brake

6

Association, the Brotherhood of Locomotive Engineers, the International Association of Railway Operating Officers, and the Operating Rules Association of North America, and has been qualified to testify in the area of railroad operations, procedure, rules, safety, train handling, and standards of care. [See Doc. 529; Exh. E; Exh. A, Culver C.V. at 3-4].[1]

On the basis of these credentials, the Court finds that Mr. Culver qualifies as an expert in the area of railroad operations.

## 2. Culver Opinions Sought to be Excluded

### A. Visibility of the Truck at the Crossing

BNSF first seeks to exclude Mr. Culver's "'opinion that when he was at the accident site he was able to see the Duran truck on the crossing when he was more than 4,000 feet west of the crossing, and therefore the BNSF crew should have seen if from the same distance." [Doc. 495 at 5].

---

[1] Mr. Culver also has been prevented from testifying as an expert, although it does not appear that these exclusions were based upon a conclusion that he was not qualified.  Rather, it appears that courts that have excluded his testimony have done so after having determined that his opinions either (1) would not have assisted the jury, [see Doc. 495; Exh. C, exclusion from District Court of Cowley County, Kansas]; or (2) lacked foundation, see Guidroz-Brault v. Missouri Pacific R. Co., 254 F.3d 825, 830 (9th Cir. 2001).  In fact, in Guidroz-Brault, the Ninth Circuit expressly commented on Mr. Culver's "extensive experience as an engineer and as an instructor in rules, safety, train handling, field efficiency testing, and derailment investigation. . . ."  Id.  That Court also held that "[t]he district court abused its discretion by excluding Culver's testimony regarding railroad operating procedure and standards of care of a locomotive engineer [because t]hat testimony was relevant on the subject of an engineer's lookout and appropriate procedure."  Id.  According to the Ninth Circuit, the problem with "Culver's opinion *beyond the need for a proper lookout*" was that it made assumptions that found no support in the evidence of record.  Id. (emphasis added).

In Mr. Culver's original report, he opined that

> [a]s the train came out of a right-hand curve, clearing the escarpment west of the crossing, visibility, as determined by a site visit performed on November 1, 2007, was clear to the crossing for well over 1/2 mile.  From this point, 1/2 mile from the crossing, the crew should . . . have observed the stopped vehicle[]. . . .

[Doc. 529; Exh. F, April 23, 2008 Culver report at 7].

In his second report, however, Mr. Culver stated that

> [u]pon review of reports of other experts who have determined the actual distance from which such a vehicle can be seen by an approaching train crew, I now refer to the report of Curtis J. Flynn in which he explained that a vigilant train crew should be able to identify such a vehicle on the crossing from a distance of 4,066 feet. . . .

[Id.; Exh. I, June 2, 2008 Culver report at 1].

On November 1, 2007, the day that Mr. Culver conducted his site visit, Curtis Flynn, the Valencia parties' proposed accident reconstructionist, also visited the scene, taking measurements and photographs, which are the subject of a separate motion in limine.  See Doc. 494.  Mr. Culver, however, has explained that, in reaching the conclusion that the train crew should have been able to see the crossing from approximately 4,000 feet away, he was "referring to [Mr. Flynn's measurement from the curve to the crossing where he and I both verified that we could see the crossing from that point.  *Not his photographs*." [Doc. 531; Exh. D, Culver depo. at 194 (emphasis added)].[2]

---

[2] [See also Doc. 494; Exh. 14, Culver depo. at 174 ("Q: To what extent are you relying on the Flynn photographs for your opinions? A: I am not relying on them.") and at 194 ("A: I relied on [Curtis Flynn's] measurement, not anything with his photographs.")].

The Court will exclude Mr. Culver's proposed opinion about what the train crew should have seen from approximately 4,000 feet west of the crossing.  As an initial matter, Mr. Culver's testimony on this point is not based on any scientific, technical, or other specialized knowledge.  See Fed.R.Evid. 702.  Instead, it is based on his lay observation. Additionally,  what Mr. Culver says he saw while "walking on the side of the tracks[,]" [see Doc. 495; Exh. A, Culver depo. at 16], is  unlikely to be of much assistance the jury, which will be charged with determining what Mr. Ray and Mr. Owens should have seen from the cab of an eastbound train moving at approximately 64 or 65 miles per hour and toward a rising sun.  Finally, the methodology that Mr. Culver employed in coming to the conclusion that the crew should have been able to identify Ms. Duran's truck from 4,000 feet away has not been explained and, to the extent it has, is utterly confusing.

According to Mr. Culver, he "relied on Mr. Flynn's measurements[]" for his visibility opinion. [Doc. 531; Exh. D, Culver depo. at 193].  He also stated, however, that he might have "misspoken" when he said that the crew should have seen Ms. Duran's truck from a distance of 4,066 feet, since he did not "see that number in Mr. Flynn's report." [Id.; Exh. D, Culver depo. at 191].  Finally, Mr. Culver has not explained how or why the Flynn measurements, in and of themselves, caused Mr. Culver to revise his original opinion (that the crew should have observed Ms. Duran's truck from 1/2 mile away, as set forth in his April 23, 2008 expert report) into the opinion that the crew should have seen the truck from 4,000 (or 4,066) feet away.  Adding to the unreliability of Mr. Culver's visibility opinion is that fact that the truck that was on the crossing the day he conducted his site visit was a white

9

truck, whereas Ms. Duran's truck was blue and black in color. [See Doc. 494; Exh. 8].

Because Mr. Culver's opinion as to what he could see the day he conducted his site visit is unlikely to assist the jury, and because his opinion that the crew should have seen Ms. Duran's truck from 4,000 (or more) feet from the crossing is without apparent methodology, the Court will grant BNSF's motion in limine to the extent it seeks to exclude Mr. Culver's opinion about the visibility of Ms. Duran's truck at the crossing.

### B. Opinions that the Engineer Should have Continued Blowing the Horn after he "Went to the Floor" Immediately before Impact

BNSF next seeks to exclude Mr. Culver's opinion that Marlin Ray was "obligated to 'continue to reach that horn button [upon on the panel] and sound the horn on their approach to the crossing' while [Engineer Ray] was 'on the floor' of the cab." [Doc. 495 at 6].

Through his deposition, Mr. Culver testified that

> [i]f there is, in fact, someone occupying the vehicle in front of that train, the engineer should do everything he can to get that person's attention to get it out of the way, even if it means ducking for cover, because the configuration of the cab is such that the engineer can still blow that horn from under the table.

[Doc. 475; Exh. A, Culver depo. at 217].

The Court has determined that Mr. Culver qualifies through education, training, and experience as an expert in the area of railroad operations, which includes railroad operating rules.  However, when questioned as to whether there is a rule "that says what you do with the whistle if the engineer encounters something blocking the tracks that he believes puts his crew's life in danger[,]" Mr. Culver responded, "I don't know if there is a specific rule that

10

says if there is something blocking the track, that the—that puts the engineer's life in danger." [Doc. 495; Exh. A, Culver depo. at 216]. Mr. Culver similarly was unaware of a BNSF rule or provision in the General Code of Operating Rules stating that crew members are required to risk their own lives when they reasonably believe they are in danger. [Id.]. Thus, Mr. Culver has not based this opinion on any operating rule within his area of expertise.

Instead, Mr. Culver explained that he was able to form this opinion because when he was an engineer he once was involved in an incident where a cement truck was sitting on the tracks ahead of his train, and he continued to "bl[o]w that horn right up until the point if impact . . . right up to the point where [he] was right on top of that truck. . . ." [Doc. 529; Exh. B, Culver depo. at 219]. However, when pressed as to whether he continued to sound the horn once he had thrown himself to the floor of his cab, Mr. Culver responded, "Once I hit [the floor], there was no point. There was nothing to blow for. . . ." [Id.; Exh. B, Culver depo. at 221-222].

The Advisory Notes to Rule 702 of the Federal Rules of Evidence provide that "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702 advisory committee's note. Because Mr. Culver has not testified that he continued to sound the horn after he went to the floor during his own train/truck collision, the Court concludes that his single experience does not provide a sufficient basis for his opinion here that

11

Engineer Ray should have continued to sound the horn after he attempted to take cover on November 1, 2006. Because Mr. Culver did not do what he suggests Mr. Ray should have done, he has not demonstrated how his experience "is reliably applied to the facts." Fed.R.Evid. 702 advisory committee's note.

The Court will exclude Mr. Culver's opinion that after Mr. Ray "went to the floor" immediately before impact with Ms. Duran's truck, he should have continued to sound the horn. BNSF's motion in limine will be granted as to this point.

### C. Opinions that the Sun, Safety Eyeglasses, and Sun Visor Comprised "Unusual Conditions" under BNSF Rule 6.21

Mr. Culver has testified through his deposition that an "unusual condition" existed because Brian Owens' "sun visor was not working properly to shade his eyes [and h]is glasses were not providing the necessary protection to enable him to see." [Doc. 539; Exh. B, Culver depo. at 232]. According to Mr. Culver, these deficiencies amounted to unusual conditions under BNSF Rule 6.21. BNSF seeks to exclude Mr. Culver's opinion on this point.

BNSF Rule 6.21 is titled "Precautions Against Unusual Conditions" and states:

> Protect trains and engines against any known condition that may interfere with their safety.
>
> When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications.
>
> In unusually heavy rain, storm, or high water, trains and engines must approach bridges, culverts, and other potentially hazardous points prepared to stop. If they cannot proceed safely, they must stop until it is safe to resume movement.

> Advise the train dispatcher of such conditions by the first available means of communication.

[Doc. 495; Exh. E].

As an initial matter, it is undisputed that the sun was shining the morning of the accident in this matter. There has been no allegation of any "unusually heavy rain, storm, or high water."

It also is undisputed that the crew was able to observe and comply with signal indications. Through his deposition, Brian Owens testified (and this Court has previously found) that "he had just recorded having passed a 'green'—or 'clear'—signal when he looked up and saw something he thereafter recognized as a truck." [Doc. 586 at 14 (*citing* Doc. 360; Exh. 3, Owens depo. at 54-57)]. Similarly, there has been no allegation that the crew failed to observe the whistle board, which the Valencia parties submit may be interpreted as a "signal" for purposes of Rule 6.21. [See Doc. 529; Exh. B, Culver depo. at 225 (conceding that the crew saw both the signal and whistle boards); see also Doc. 529 at 11].

Finally, when asked about his basis for his interpretation of Rule 6.21, Mr. Culver referred only to the rule itself, along with BNSF Rule 1.1.1, which states no more than "[i]n case of doubt or uncertainty, take the safe course." He also stated that he did not believe he had "ever directly addressed the sun" as amounting to an "unusual condition" within the scope of Rule 6.21. [Doc. 529; Exh. B, Culver depo. at 236]. Thus, even an experiential basis for this opinion is lacking.

"The trial court's gatekeeping function requires more than simply taking the expert's word for it. Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." United States v. Nacchio, 519 F.3d 1140, 1175 (10th Cir. 2008) (internal citations omitted). In this case, the Court concludes that Mr. Culver's opinion is not reliable, as it is not based upon sufficient facts or data. Accordingly, the Court will grant BNSF's motion in limine to exclude Mr. Culver's opinions that the sun, visor, and Mr. Owens' safety glasses amounted to "unusual conditions" for purposes of BNSF Rule 6.21.

### D. Opinions Interpreting New Mexico Statute

BNSF has moved to exclude "Mr. Culver's [opinion] that New Mexico statutes require a train crew to 'give an audible warning of their approach to all highway crossing 80 rods, 440 yards before [the crossing].'" [Doc. 495 at 9]. BNSF asks the Court to "exclude any opinion by Mr. Culver about what New Mexico law requires of a train crew as the locomotive approaches the crossing." [Id.].

In response, the Valencia parties assert that "[a]s Mr. Culver testified in his deposition, he is not giving ant legal opinion as to what New Mexico law is." [Doc. 529 at 12].

As this issue now appears to have become a non-issue, the Court will grant BNSF's motion in limine on this point as unopposed.

### E. Opinions Characterizing Deposition Testimony

Lastly, BNSF seeks to exclude what it terms Mr. Culver's interpretation of Marlin Ray's deposition testimony that on the morning of the collision, "it was slumber, more or less." [Doc. 495 at 10; <u>see also</u> Doc. 360; Exh. 2, Ray depo. at 182]. According to BNSF, "Mr. Culver interprets this testimony as meaning that [Marlin Ray] was sleeping in the moments leading up to the subject collision and therefore was not an alert and attentive engineer keeping a proper lookout." [Doc. 495 at 10-11].

Engineer Ray has been listed as a witness that BNSF "will call or have available at trial. . . ." [<u>See</u> Doc. 592 "Pretrial Order" at 62]. Because Engineer Ray will be available for both direct and cross-examination, it is not necessary that Mr. Culver interpret for the jury what he believes Mr. Ray meant when he testified in his deposition that "it was slumber, more or less." To the contrary, Mr. Ray's own trial testimony will be the best evidence of what he intended by his use of the term "slumber." Mr. Culver's interpretation is not necessary, nor is it likely to assist the jury. Accordingly, to the extent that BNSF seeks to preclude Mr. Culver from providing an opinion as to what Engineer Ray intended by his use of the word "slumber," BNSF's motion in limine will be granted.

To the extent that evidence is presented that Engineer Ray or other crew members were asleep in the moments heading up to the collision, and Mr. Culver intends to testify that such circumstance would prevent the crew from, for example, keeping a proper lookout; maintaining a safe course; or remaining alert or attentive, as prescribed by the General Code of Operating Rules, such testimony must be excluded.

Obviously should the jury be presented with evidence that the crew were asleep immediately prior to the collision, I find that it would not require the expertise of Mr. Culver to draw the jurors' attention to the fact that such circumstance would necessarily affect one's ability to keep a proper lookout; maintain a safe course; or be alert or attentive. This is something the jurors can assess for themselves. I thus find that such testimony from Mr. Culver would not assist the jury.

## III. CONCLUSION

For the reasons stated more fully herein, the Court will grant *Plaintiff BNSF Railway Company's Sixth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Charles Culver, Pursuant to the Federal Rules of Evidence and Daubert.* As always, these pretrial evidentiary rulings are subject to reconsideration in the event that unforeseen circumstances or a change in context should arise during the trial.

**IT IS, THEREFORE, ORDERED** that *Plaintiff BNSF Railway Company's Sixth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Charles Culver, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 495] is **GRANTED**.

**SO ORDERED** this 9th day of February, 2009, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge