# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

BNSF RAILWAY COMPANY,

      Plaintiff,

vs.

LAFARGE SOUTHWEST, INC.; STELLA
R. VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; and GREGORY
MARTINEZ and DARLENE COLEMAN,
Personal Representatives of the Estate of
Carol E. Duran,

      Defendants.

CIVIL NO. 06-1076 MCA/LFG

========================================

STELLA R. VALENCIA, individually, and as
Personal Representative of the Estate of Robert J.
Valencia, JOHN KELLY VALENCIA, DESIREE
RICHELLE VALENCIA, STEPHANIE ESTELLE
VALENCIA, and LILLIAN S. VALENCIA,

      Counter Claimants/Cross-Claimants/
      Third-Party Plaintiffs,

vs.

BNSF RAILWAY COMPANY, and DARLENE
COLEMAN, Personal Representative of the
Estate of Carol E. Duran,

      Counter-Defendants/Cross-Defendants,

MIKE TAFT, d/b/a Taft Construction;
and EL PASO NATURAL GAS COMPANY

      Third-Party Defendants.

========================================

LAFARGE SOUTHWEST, INC.

     Third-Party Plaintiff/Cross-Plaintiff

vs.

DARLENE COLEMAN, individually, and as Personal
Representative of the Estate of Carol E. Duran; GREG
GUTIERREZ and MATTHEW RAY DURAN, individually,

     Plaintiffs,

vs.

BNSF RAILWAY COMPANY; LAFARGE SOUTHWEST,
INC.; STELLA VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; MIKE TAFT, d/b/a Taft
Construction; and EL PASO NATURAL GAS CO.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiff BNSF Railway Company's Fourth Motion in Limine, to Exclude Opinions and Testimony of Claimants' Expert Curtis Flynn Relating to Railroad Operations, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 496] filed October 29, 2008. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court will grant the motion.

## I. BACKGROUND

This action arises from a fatal collision between an eastbound freight train operated by Plaintiff BNSF Railway Company (through its engineer, Marlin Ray, and its conductor,

2

Brian Owens) and a commercial dump truck that was being driven by decedent Carol Duran. On November 1, 2006, Ms. Duran, a contractor for Defendant/Third-Party Plaintiff Lafarge Southwest, Inc., was delivering gravel to a construction site adjacent to railroad tracks when, at the apparent direction of her supervisor, Lafarge employee and decedent Robert Valencia, she stopped her truck on a crossing on the tracks in order to speak with him.  Both Ms. Duran and Mr. Valencia were killed as a result of the train colliding with Ms. Duran's fully loaded truck.  The accident occurred at approximately 7:30 a.m., in sunny conditions.

Eastbound trains, such as the one involved in this accident, negotiate a series of curves in the final miles leading to the crossing at which Ms. Duran and Mr. Valencia were struck. The last of these curves is a left-hand curve approximately 4,000 feet west of the crossing. There is an escarpment at this final curve, but once the escarpment is passed and the final curve negotiated, the stretch of track between this point (4,000 feet west of the crossing) and the actual crossing is straight, and the view between the two points unobstructed.  A whistle board (a sign with a black "W" to alert the train crew to activate the whistle) sits 1,320 feet (one-quarter of a mile) west of the crossing.  It is highly contested whether Ms. Duran's truck was already on the crossing at the time the train cleared the escarpment (the claimants' position), or whether she came upon the crossing when the train was already past the escarpment and either at or in the area of the whistle board (BNSF's position).

On November 1, 2007, the one-year anniversary of the collision, Curtis Flynn, the Valencia parties' proposed expert witness on accident reconstruction, visited the scene of the accident.  Mr. Flynn took photographs meant to establish what Engineer Ray and Conductor

3

Owens should have seen as their train approached the crossing.[1] Mr. Flynn also measured the geometry of the track and approaches to the crossing and, then used these numbers "to determine geometry and relative positioning of various objects." [Doc. 530; April 29, 2008 report of Curtis J. Flynn]. In preparing his report, Mr. Flynn relied on, among other materials, copies of pleadings filed in the case; a copy of the accident report; and the deposition testimony of Engineer Ray and Conductor Owens. [Id. at 4-5].

On the basis of his review, Mr. Flynn has opined, among other things, that

> [i]n this instance the train crew was obviously inattentive and failed to maintain a proper lookout as evidenced by the unobstructed view and the failure to initiate timely emergency procedures. Clearly the train crew had a duty not only to warn Mr. Valencia and Ms. Duran to the best of their ability by activating the whistle but also to timely initiate emergency braking procedures that could under the circumstances have avoided this accident. Given the available options that I have listed above, had Robert Valencia and Carol Duran been afforded additional warning sufficient to get their attention, then they would have certainly had enough time in which to vacate the crossing.

[Flynn report at 8].[2]

---

[1] In a motion in limine separate from the one at issue here, BNSF has moved to exclude a number of Mr. Flynn's photographs as inadmissible on grounds including, but not limited to, that these photographs are "irrelevant, misleading, and unduly prejudicial" because they were taken with a telephoto lens and, therefore, do not accurately portray what could have been seen with the naked eye. [See Doc. 494 at 2-3]

[2] When the Valencia parties filed their Response to BNSF's motion, they attached only part of Mr. Flynn's report. They then filed an Errata, attaching the remaining pages. For that reason, pages 5 through 8 of the report were filed as an attachment to the Response [Doc. 528], while pages 1 through 4 were filed as the Errata [Doc. 530]. For purposes of simplifying matters, after the initial citation, the report is referred to in this Opinion simply as the "Flynn report."

BNSF now moves to exclude Mr. Flynn's opinions as to the train crew's duties as both (1) beyond his area of expertise; and (2) not likely to assist the jury. [See Doc. 496 at 6-13].

## II. ANALYSIS

Rule 702 of the Federal Rules of Evidence imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993). The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function. See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000). As part of its gatekeeping function, and in addition to determining whether the proposed expert is qualified to offer an opinion, the Court must also determine whether (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Reliability under Daubert is determined by looking at whether the reasoning or methodology

5

underlying the testimony is scientifically valid, and relevance is determined by whether that reasoning or methodology properly can be applied to the facts in issue. Smith v. Sears Roebuck and Co., 232 Fed.Appx. 780, 781 (10th Cir. 2007).

**1. Mr. Flynn's Qualifications**

Since 1994, Curtis Flynn as been the President of Flynn & Associates, Inc. (which he also founded), a group that specializes in forensic traffic accident reconstruction consulting and special investigations. Prior to that, Mr. Flynn served from 1989 until 1994 as President of Litigant Services, Inc., "a business venture in [t]raffic [a]ccident [r]econstruction & [c]ommercial [i]nvestigations and [c]onsulting." [Doc. 528; Exh. A, Flynn resume at 1]. Thus, Mr. Flynn has spent the past 20 years working in the field of accident reconstruction.

Mr. Flynn was accredited in 1993 as a traffic accident reconstructionist through the Accreditation Commission for Traffic Accident Reconstruction ("ACTAR"). He also is currently a member of the (1) Southwestern Association of Technical Accident Investigators; (2) Texas Association of Accident Reconstruction Specialists; and (3) National Association of Professional Accident Reconstruction Specialists, Inc. [Doc. 528; Exh. A, Flynn resume at 3-4].

Mr. Flynn has received training in such areas as (1) applied vehicle dynamics; (2) analysis of low-speed collisions; (3) motorcycle accident reconstruction; (4) pedestrian/bicyclist accident investigation and reconstruction; (5) advanced commercial vehicle accident investigation and reconstruction; (6) biomechanics for traffic accident reconstruction; and (7) on-scene accident investigation. He also has received training in

crash data retrieval from air bag sensor event data recorders; forensic mapping of the topography of an accident scene; and advanced microcomputer-assisted traffic accident reconstruction. [Doc. 528; Exh. A, Flynn resume at 4-9].

On the basis of these credentials, the Court concludes that Mr. Flynn qualifies through experience, training, and education as an expert in the field of accident reconstruction.

**2. Flynn opinion to be excluded**

BNSF seeks to exclude Mr. Flynn's proposed opinions to the extent they "are directed to the standard of care applicable to railroad operations, including when the BNSF train crew should have seen the Duran truck, when the crew should have sounded the horn, and when the crew should have engaged emergency braking." [Doc. 496 at 7]. Specifically, BNSF challenges Mr. Flynn's qualifications to conclude the following:

> In this instance, the train crew was obviously inattentive and failed to maintain a proper lookout as evidenced by the unobstructed view and the failure to initiate timely emergency procedures. Clearly the train crew had a duty not only to warn Mr. Valencia and Ms. Duran to the best of their ability by activating the whistle but also to timely initiate emergency braking procedures that could under the circumstances have avoided this accident. A reasonably attentive train crew, beginning the perception and reaction process 4,066' and 43 seconds from the crossing . . . could have brought [the train] to s stop prior to the crossing.

[Doc. 496 at 7 (*quoting* Flynn report of April 29, 2008 and Flynn report of May 29, 2008].[3]

---

[3] Mr. Flynn's May 29, 2008 report does not appear to have been made a part of the record.

As BNSF makes clear, it "does not seek to exclude Flynn's *accident reconstruction* opinions, and does not dispute, at this point, his qualifications to give certain of those opinions." [Doc. 563 at 2 (emphasis added)].  Instead, "BNSF objects to Flynn's opinions relating to railroad operations: that the crew was 'inattentive' and should have sounded the horn earlier and should have engaged emergency braking earlier than they did." [Id.].

Mr. Flynn has no training as either a railroad conductor or a railroad engineer.  He has no training in railroad operations.  Through his deposition, Mr. Flynn testified that his training on that topic comes from "what [he has] learned through reading various texts and authoritative texts and so forth on railroad operations." [Doc. 596; Exh. A, Flynn depo. at 13].  With respect to the discrete issue of sounding a railroad whistle, Mr. Flynn testified that he "[went] through . . . look[ed] at . . . and made a copy of . . . the one and only book [he has] on train accident investigation, 'Train Accident Reconstruction and FELA and Railroad Litigation,' Fourth Edition." [Id.; Exh. A, Flynn depo. at 77].

When asked whether is an expert in human factors, Mr. Flynn stated that he is, "as it applies to motor vehicle traffic accident reconstruction work." [Doc. 596; Exh. A, Flynn depo. at 13].  However, when asked if he considers himself "a human factors expert as far as train crews are concerned[,]" Mr. Flynn responded, "Only as it would apply to normal reactions and so forth, of human individuals in emergency situations and routine situations. It's pretty much the same as it would be for commercial vehicle operators, as well as motorists." [Id.].  Mr. Flynn has never been at the controls of a train, or even in the cab of a locomotive except for one time that he took litigation-related photographs from a cab, and

8

another time when he was "a kid, looking at some museum exhibits." [Id.; Exh. A, Flynn depo. at 176]. Mr. Flynn admits that he is "not a train expert[,]" though he believes that the issues here relating to the crew members' sounding of the whistle and/or horn and their application of the emergency brakes constitutes "time and distance analysis, and that is reasonable human factors analysis that is part and parcel to accident reconstruction." [Id.; Exh. A, Flynn depo. at 189].

As explained, BNSF does not challenge Mr. Flynn's qualifications as an accident reconstructionist, and the Court has concluded that he qualifies as an expert in that field. But even Mr. Flynn has described himself as "not a train expert." [Doc. 596; Exh. A, Flynn depo. at 189]. The Court further concludes that some specialized expertise in the area of railroad operations is a foundational prerequisite to the offering of the challenged opinion here.

The Tenth Circuit has held that "[t]hough a proffered expert possesses knowledge as to a general field, the expert who lacks specific knowledge does not necessarily assist the jury." City of Hobbs v. Hartford Fire Ins. Co., 162 F.3d 576, 587 (10th Cir. 1998). The two post-Daubert cases cited by the Valencia parties in support of the converse (*i.e.*, that "[c]ourts routinely hold that experts are not required to possess specialized or first-hand knowledge of every component or specific element of an area as to which he or she possesses general expertise" [Doc. 528 at 6]), do not persuade this Court otherwise, as those cases deal with (1) witnesses who were "amply qualified as experts in their respective fields" testifying to matters about which neither possessed firsthand knowledge, thus drawing a challenge on

9

reliability grounds, see Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1244 (10th Cir. 2000), and (2) an expert in the field of the interaction between machines and people who was offered to provide expert testimony on behalf of a plaintiff who argued that her interaction with an airline baggage-claim system caused her injury, see Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 82 (2d Cir. 1997). Thus, notwithstanding Mr. Flynn's qualifications as an expert in the field of accident reconstructionist, the Court concludes that he does not qualify as an expert in the field of railroad operations, which is the subject his challenged testimony purports to address.

Even if this Court were to determine that Mr. Flynn is qualified to provide an opinion as to the duties of the train crew in this case, exclusion would still be required because the proffered opinions are unlikely to assist the jury inasmuch as they are based on Mr. Flynn's stated (but erroneous) belief that the crew in this case was under the duty "to sound the horn and apply the brakes . . . when they could have reasonably seen the obstruction in the roadway, the vehicle in the roadway." [Doc. 496; Exh. A, Flynn depo. at 181].

To be sure, it was Mr. Flynn's professional opinion that the crew was obligated to sound the horn and apply the brakes

> [w]hen they should have been able to see the truck in the roadway and see that there was a danger. . . . My examination of the scene indicates that at 4,000 feet, it should be becoming apparent to them. . . . As soon as they noticed that there was a danger, they were required to apply the emergency brake by their own rules, by their own admission, by their own testimony.

[Doc. 496; Exh. A, Flynn depo. at 181-182].

When pressed further as to his opinion about the distance at which the crew should have applied the emergency brake, Mr. Flynn responded

> I believe, from my own observations at the scene, that you can start seeing the intersection, you can start realizing that there is a problem at 4,000 feet. Giving them the benefit of the doubt and saying, all right, over the next six, almost seven seconds, this is their decision process, then they should have at least been on the brakes by 3429 feet. There's your distance.

[Doc. 496; Exh. A, Flynn depo. at 182]. Notwithstanding the apparent lack of any methodology for reaching the "six, almost seven seconds" calculation, the well-settled law is that a train crew may assume that a vehicle on or approaching a railroad crossing will stop, move out of the train's way, or otherwise yield to that train. See, e.g., Nye v. CSX Transp., Inc., 437 F.3d 556, 567 (6th Cir. 2006); Woods v. Amtrak, 982 F.Supp. 409, 412-413 (N.D.Miss. 1997); Bryan v. Norfolk & W. Ry Co., 21 F.Supp.2d 1030, 1035 (E.D.Mo. 1997); Price v. Nat'l R.R. Passenger Corp., 14 P.3d 702, 708 (Utah App. 2000). This Court has already so held in its December 8, 2008 *Memorandum Opinion and Order* addressing the dispositive motions docketed as entries 355, 360, and 367. Consequently, even if the Court were to conclude that Curtis Flynn is qualified to provide the proffered opinions as to the duties of the train crew in this case, those opinions would nevertheless require exclusion because they are based on an erroneous understanding of the state of the law and, therefore, would not assist the jury. See Southard v. United Reg'l Health Care Sys., Inc., 2008 WL 4489692, at *2 (N.D.Tex., Aug. 5, 2008) ("[W]here . . . the expert's opinion is based on an erroneous legal premise, it is appropriate to exclude such testimony."); see also Loeffel Steel

11

Products, Inc. v. Delta Brands, Inc., 387 F.Supp.2d 794, 806 (N.D.Ill. 2005) ("Expert opinions that are contrary to law are inadmissible.").

### III. CONCLUSION

For the reasons stated more fully herein, the Court will grant *Plaintiff BNSF Railway Company's Fourth Motion in Limine, to Exclude Opinions and Testimony of Claimants' Expert Curtis Flynn Relating to Railroad Operations, Pursuant to the Federal Rules of Evidence and Daubert*. As always, these pretrial evidentiary rulings are subject to reconsideration in the event that unforeseen circumstances or a change in context should arise during the trial.

**IT IS, THEREFORE, ORDERED** that *Plaintiff BNSF Railway Company's Fourth Motion in Limine, to Exclude Opinions and Testimony of Claimants' Expert Curtis Flynn Relating to Railroad Operations, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 496] is **GRANTED**.

**SO ORDERED** this 12th day of February, 2009, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge