# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BNSF RAILWAY COMPANY,

      Plaintiff,                                  CIVIL NO. 06-1076 MCA/LFG

vs.

LAFARGE SOUTHWEST, INC.; STELLA
R. VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; and GREGORY
MARTINEZ and DARLENE COLEMAN,
Personal Representatives of the Estate of
Carol E. Duran,

      Defendants.

========================================

STELLA R. VALENCIA, individually, and as
Personal Representative of the Estate of Robert J.
Valencia, JOHN KELLY VALENCIA, DESIREE
RICHELLE VALENCIA, STEPHANIE ESTELLE
VALENCIA, and LILLIAN S. VALENCIA,

          Counter Claimants/Cross-Claimants/
          Third-Party Plaintiffs,

vs.

BNSF RAILWAY COMPANY, and DARLENE
COLEMAN, Personal Representative of the
Estate of Carol E. Duran,

          Counter-Defendants/Cross-Defendants,

MIKE TAFT, d/b/a Taft Construction;
and EL PASO NATURAL GAS COMPANY

          Third-Party Defendants.

========================================

LAFARGE SOUTHWEST, INC.

      Third-Party Plaintiff/Cross-Plaintiff

vs.

DARLENE COLEMAN, individually, and as Personal
Representative of the Estate of Carol E. Duran; GREG
GUTIERREZ and MATTHEW RAY DURAN, individually,

      Plaintiffs,

vs.

BNSF RAILWAY COMPANY; LAFARGE SOUTHWEST,
INC.; STELLA VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; MIKE TAFT, d/b/a Taft
Construction; and EL PASO NATURAL GAS CO.,

      Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiff BNSF Railway Company's Fifth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Jimmy Scott, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 497] filed October 29, 2008. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

      This action arises from a fatal collision between an eastbound freight train operated by Plaintiff  BNSF Railway Company (through its engineer, Marlin Ray, and its conductor,

Brian Owens) and a commercial dump truck that was being driven by decedent Carol Duran. On November 1, 2006, Ms. Duran, a contractor for Defendant/Third-Party Plaintiff Lafarge Southwest, Inc., was delivering gravel to a construction site adjacent to railroad tracks when, at the apparent direction of her supervisor, Lafarge employee and decedent Robert Valencia, she stopped her truck on a crossing on the tracks in order to speak with him.  Both Ms. Duran and Mr. Valencia were killed as a result of the train colliding with Ms. Duran's fully loaded truck.   The accident occurred at approximately 7:30 a.m., in sunny conditions.   It is undisputed that the crossing in question was a "passive" crossing, meaning that its location was indicated by signs, marking or other devices that would "do not change aspect upon the approach or presence of a train."  See 23 C.F.R. § 646.204.[1]

Eastbound trains, such as the one involved in this accident, negotiate a series of curves in the final miles leading to the crossing at which Ms. Duran and Mr. Valencia were struck. The last of these curves is a left-hand curve approximately 4,000 feet west of the crossing. There is an escarpment at this final curve, but once the escarpment is passed and the final curve negotiated, the stretch of track between this point (4,000 feet west of the crossing) and the actual crossing is straight, and the view between the two points unobstructed.  A whistle board (a sign with a black "W" to alert the train crew to activate the whistle) sits 1,320 feet (one-quarter of a mile) west of the crossing.  It is highly contested whether Ms. Duran's truck

---

[1]  By contrast, an active crossing is one that uses "those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen. . . ."  23 C.F.R. § 646.204.

was already on the crossing at the time the train cleared the escarpment (the claimants' position), or whether she came upon the crossing when the train was already past the escarpment and either at or in the area of the whistle board (BNSF's position).

Notwithstanding the dispute over the precise amount of time that Ms. Duran's truck was on the tracks, it is undisputed that the train "was around the whistle board" when the crew "knew there was something at the crossing" and that, within "a matter of seconds" the crew "visualized it was a truck." [Doc. 567; Exh. I, depo. of Marlin Ray at 117].  At that point of emergency, Engineer Ray "slammed [his] dynamic[,] slammed [his] emergency brake valve[,]"and got down on the floor of the cab. [Id.; Exh. I, depo. of Marlin Ray at 115].

On November 1, 2007, the one-year anniversary of the collision, Jimmy C. Scott, the Duran parties' proposed expert witness on railroad operations, visited the scene of the accident.  On that day, a white dump truck was placed on the crossing.  Ms. Duran's truck was blue and black in color.  On the basis of his visit, as well as his review of deposition testimony; photographs of the scene; police reports; and more, Mr. Scott has formed a number of opinions, which BNSF now seeks to exclude as inadmissible on numerous grounds. [See generally Doc. 497].

## II. ANALYSIS

Rule 702 of the Federal Rules of Evidence imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The relevance of such testimony

also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function. See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000). As part of its gatekeeping function, and in addition to determining whether the proposed expert is qualified to offer an opinion, the Court must also determine whether (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Reliability under Daubert is determined by looking at whether the reasoning or methodology underlying the testimony is scientifically valid, and relevance is determined by whether that reasoning or methodology properly can be applied to the facts in issue. Smith v. Sears Roebuck and Co., 232 Fed.Appx. 780, 781 (10th Cir. 2007).

**1. Mr. Scott's Qualifications**

BNSF seeks to prevent expert testimony from Mr. Scott on grounds that Mr. Scott (1) "opines on numerous subjects far beyond his expertise[;]" and (2) provides a number of opinions that "suffer from an utter lack of factual or methodological foundation and are unreliable." [Doc. 497 at 2].

Jimmy Scott is a railroad operations consultant and licensed locomotive engineer. Since 1995, he has been employed with Scott & Associates, Inc., in Blountville, Tennessee. Prior to forming Scott & Associates, Mr. Scott worked for CSX Corporation as a (1) road foreman of engines; (2) district road foreman of engines; and (3) general road foreman. He also served as a brakeman, foreman, conductor, and as a locomotive engineer. His resume reflects that Mr. Scott was with CSX from 1969 until 1992. [Doc. 532; Exh. B, Resume of Jimmy Scott].

While with CSX, Mr. Scott was a member of the Derailment Investigative Teams and the Safety Committee. He was jointly responsible with other employees for consolidating various train handling and air brake rules books. Mr. Scott also was responsible for the annual retraining of locomotive engineers using train simulators. [Doc. 532; Exh. B, Resume of Jimmy Scott].

Mr. Scott is a graduate of Northeast Alabama State Junior College and has attended the New York Air Brake School in Watertown, NY, and the GE Road Foreman School (CSX Transportation) in Erie, PA. Mr. Scott also has received training in railroad track inspection and safety standards from the University of Tennessee. [Doc. 532; Exh. B, Resume of Jimmy Scott]. He is trained on the proper use and downloading requirements for locomotive event recorders, and currently contracts with Alion Science (formerly a division of the Illinois Institute of Technology) for the use of their train simulator. Over the past four years, Mr. Scott has testified either through deposition or at trial, or both, as an expert witness in a number of cases in both state and federal court. [Doc. 532; Exh. B, Resume of Jimmy Scott].

On the basis of these credentials, the Court finds that Jimmy Scott qualifies by experience, training, and education as an expert in the field of railroad operations.

## 2. Scott Opinions Sought to be Excluded

### a. Visibility of the Truck at the Crossing

BNSF first seeks to exclude Mr. Scott's "'opinion that when he was at the accident site a year after the collision he was able to see the Duran truck on the crossing when he was more than 4,000 feet west of the crossing, and therefore the BNSF crew should have seen it from the same distance." [Doc. 497 at 5].

The Court will exclude Mr. Scott's proposed opinion about what the train crew should have seen from approximately 4,000 feet west of the crossing. As an initial matter, Mr. Scott's testimony on this point is not based on any scientific, technical, or other specialized knowledge. See Fed.R.Evid. 702. Instead, it is based on his lay observation. Additionally, what Mr. Scott says he saw "from the ground[,]" [see Doc. 532; Exh. A, Scott depo. at 108], is unlikely to be of assistance the jury, which will be charged with determining what Engineer Ray and Conductor Owens should have seen from the cab of an eastbound train moving at approximately 64 or 65 miles per hour and toward a rising sun. For these reasons, the Court concludes that Mr. Scott's proposed testimony as to what the train crew should have seen from approximately 4,000 feet west of the crossing is neither based on any scientific, technical, or other specialized knowledge, nor is it likely to assist the jury. BNSF's motion will be granted on this point.

7

**b. Opinions That Duran Or Valencia Would Have Heard the Horn If the Crew Had Blown It Differently, or That, Had the Horn Been Blown Differently, It Would Have Made a Difference In the Outcome**

BNSF also seeks to preclude Mr. Scott from testifying that (1) Ms. Duran and Mr. Valencia would have heard a differently or longer-blown horn; (2) a differently or longer-blown horn would have affected the outcome of the events of November 1, 2006; and (3) the crew should have blown a "staccato horn sequence." [Doc. 497 at 5].

Mr. Scott testified through his deposition that he (1) is not an audiologist; (2) does not know what the conditions of audibility were inside the cab of Ms. Duran's truck; and (3) does not know at what point Ms. Duran and Mr. Valencia would have heard a differently blown horn. [Doc. 497; Exh. A-1, Scott depo. at 68; Doc. 532; Exh. A, Scott depo. at 162-164]. Nevertheless, Mr. Scott opines that "it is more likely than not" that Ms. Duran and Mr. Valencia would have heard a different horn, explaining that "had that horn been blown and blown like it should have been, they would have heard it and removed themselves from harm's way." [Doc. 532; Exh. A, Scott depo. at 163-164].

The basis for this opinion is Mr. Scott's personal experience, about which he testified:

> I have had it happen to me numerous times where I have people *approaching* a crossing. And I could tell from the behavior of that vehicle, they had not seen me and they had not heard me. I start an emergency horn signal, get their attention, *and they run right up to the crossing and stop—*
>
> If they are on my side, they look at you when you go by and they would have that look on their face of, where did you come from? That tells me two things, No. 1, they didn't see me; No. 2, they didn't hear me.

[Doc. 497; Exh. A-2, Scott depo. at 176 (emphasis added)].

The Advisory Notes to Rule 702 of the Federal Rules of Evidence provide that "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed.R.Evid. 702 advisory committee's note.  Because Mr. Scott has not testified that he has been involved in a situation where his train came upon a vehicle that was *actually stopped on the tracks*, as opposed to vehicles *approaching the tracks*, the Court concludes that his experience does not provide a sufficient basis for his opinion here that a differently or longer-blown horn would have caused a vehicle *already stopped on the crossing* to move off of the tracks.  Because Mr. Scott has not described experiential encounters like the one Engineer Ray and Conductor Owens faced on the morning of November 1, 2006, he has not demonstrated how his experience "is reliably applied to the facts."  Fed.R.Evid. 702 advisory committee's note.

Finally, Mr. Scott has offered no basis for his opinion that a "staccato horn sequence" would have changed the outcome.  In his report, Mr. Scott states:

> For many years the General Code of Operating Rules (G.C.O.R.) did indeed have a horn rule that was for emergency situations including those at grade crossings.  Engineers were required to blow a series of short blast[s] on the horn to get someone's attention that you don't otherwise have.   This staccato, or short horn blast[], was determined by the railroads to be the most effective way to get someone's attention when an emergency existed.  Several years ago, G.C.O.R. took out the section of the emergency horn signal that included the part about grade crossings.  One can only wonder the logic of this tragic decision.

9

[Doc. 532; Exh. D, Report of Jimmy Scott at 3-4].

For the reasons stated above (*i.e.*, including that Mr. Scott is not an audiologist; does not know what the conditions of audibility were inside Ms. Duran's truck; and does not know at what point Ms. Duran and Mr. Valencia would have heard a differently blown horn), the Court concludes that Mr. Scott lacks a foundation for an opinion that Ms. Duran and Mr. Valencia would have heard a staccato horn and would have reacted to it.  Mr. Scott further was unable to point to a specific railroad rule requiring the sounding of a staccato horn, noting instead that the requirement that such a horn pattern be blown at crossings such as the one at which Ms. Duran and Mr. Valencia were struck was removed from the BNSF rules book years ago. [Doc. 532; Exh. A, Scott depo. at 166-167].  Mr. Scott will not be permitted to offer the opinion that  the crew should have blown a "staccato horn sequence" or that Ms. Duran and Mr. Valencia would have heard and reacted differently to such a blast.  BNSF's motion will be granted on this point.

### c. The Rail View Camera

BNSF next seeks to prevent Mr. Scott from making the "suggestion that the lead locomotive involved in the collision was equipped with a forward looking rail view camera (and therefore that there was a video of the accident which the railroad failed to disclose or spoliated) . . . or that BNSF failed to install a rail view camera." [Doc. 497 at 7].  BNSF contends that "there is utterly no basis found in the testimony, engine specifications, or BNSF documents that the lead BN locomotive was equipped with a rail view camera. . . ."

[Id. at 6].  The Duran parties do not appear to dispute this.[2]

Nonetheless, Mr. Scott testified that his review of certain photographs caused him to believe that the locomotive was equipped with a rail view camera, explaining that a box he observed next to the windshield wiper "sure look[ed] like a rail view camera to [him,]" but allowing for the possibility that "[i]f [he is] wrong, [he is] wrong." [Doc. 497; Exh. A-1, Scott depo. at 101-102, 104].  By contrast, BNSF's proposed expert on railroad operations, Foster Peterson, looked at the same photographs and testified that Mr. Scott was "absolutely incorrect;" that the box in question was part of the windshield system; and that, in any case, the box was not even in the location that cameras are mounted. [Doc. 564; Exh. B, Peterson depo. at 183].

The Duran parties represent that if BNSF is stating under oath that this locomotive was not equipped with a rail view camera, then [Mr. Scott] has no intention of mentioning it." [Doc. 532 at 10].  Through Foster Peterson, BNSF has "stat[ed] under oath that this locomotive was not equipped with a rail view camera. . . ."  Given the circumstances, the Court will treat as unopposed BNSF's challenge to Mr. Scott's suggestion about the existence of a rail view camera, and its motion will be granted on this point.

---

[2]  [See Doc. 532 at 9]:

> Mr. Scott only raised as a possibility the existence of a rail view camera on the subject locomotive. He testified that such video had been requested in discovery but no video from a rail view camera was received. He further testified that if the subject locomotive was in fact not equipped with such a camera, then he had no intention of testifying about its possible existence.

### d. Opinions on Alleged Speed Restrictions on Curve

BNSF has sought to prevent Mr. Scott from testifying that "[a]s the eastbound train negotiated a left hand curve it had slowed to approximately 65 mph due to the speed restriction for the curve. . . ." [Doc. 532; Exh. D, Scott report at 1].  BNSF objects to any such testimony, maintaining there is no speed restriction for freight trains moving around the curve in question, and Mr. Scott was relying on a speed restriction applicable to westbound Amtrak passenger trains. [Doc. 497 at 8].

In their response, the Duran parties assert that "[t]he fact that there was or was not a speed restriction is irrelevant. Mr. Scott will be instructed by the Duran Parties' counsel to not testify that there was in fact a speed restriction at this curve. . . ." [Doc. 532 at 10]. Accordingly, to the extent that Mr. Scott proposes to testify as to a speed restriction at the curve in question, BNSF's motion will be granted as unopposed.

The Duran parties continue, however, that "if questioned about it, [Mr. Scott] should be allowed to testify regarding industry standard regarding operating speeds based upon his experience of how a train crew is taught to operate their train and at what speed." [Doc. 532 at 10].  The Court construes this proposed testimony to be a suggestion that the train was moving too fast.  To the extent that Mr. Scott intends to offer an opinion that the train in question was traveling at an excessive rate of speed, such an opinion will not be permitted, as general claims of excessive speed are preempted.  See CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 673 (1993).

**e. Opinion That the Crew Should Have Applied Full Service Braking at 4,000 Feet West of the Crossing and Emergency Braking at 2,000 Feet or 4,000 Feet West of the Crossing**

BNSF next seeks to exclude Mr. Scott's opinion that the crew should have applied full service braking when the train was 4,000 feet west of the crossing, and emergency braking when the train was 2,000 feet west of the crossing. [Doc. 497 at 8].

Through his deposition, Mr. Scott testified that he is not an accident reconstructionist, nor is he an expert in vision. [Doc. 497; Exh. A-1, Scott depo. at 69-70]. Yet his opinion as to when the crew should have applied the brakes appears to be based on his assertion that during his site inspection, he could see a dump truck on the crossing when he was still 3,000 feet away from it. He also has opined that the crew should have realized "somewhere around . . . 2,000 feet or so" that Ms. Duran's truck was "sitting down there . . . not going anywhere . . . dead across [the] main line." [Id.; Exh. A-1, Scott depo. at 58, 119].

The law is well-settled that a train crew may assume that a vehicle on or approaching a railroad crossing will stop, move out of the train's way, or otherwise yield to that train. See, e.g., Nye v. CSX Transp., Inc., 437 F.3d 556, 567 (6th Cir. 2006); Woods v. Amtrak, 982 F.Supp. 409, 412-413 (N.D.Miss. 1997); Bryan v. Norfolk & W. Ry Co., 21 F.Supp.2d 1030, 1035 (E.D.Mo. 1997); Price v. Nat'l R.R. Passenger Corp., 14 P.3d 702, 708 (Utah App. 2000). This Court has already so held in its December 8, 2008 *Memorandum Opinion and Order* addressing the dispositive motions docketed as entries 355, 360, and 367. [See Doc. 586]. "[W]hen it becomes evident that [a] person will not keep off the track it becomes the duty of [the] engineer to use ordinary care to prevent injury to such person." Nye v. CSX

Transp., Inc., 437 F.3d 556, 567 (6th Cir. 2006). Thus, to the extent that Mr. Scott appears to offer the opinion that the crew members should have taken emergency measures when it became clear to them that Ms. Duran's truck was not going to move (*i.e.*, was "dead across [the] main line"), such an opinion is sound and based on an accurate understanding of the law. That opinion would be permitted.

The problem, however, is that Mr. Scott is admittedly not an expert in either accident reconstruction or vision, yet he has testified that "in [his] opinion, 2-, 3,000 feet" from the crossing is the point at which brakes should have been applied. [Doc. 497; Exh. A-1 at 119]. By contrast, Engineer Ray has testified that he was able to make out what he believed was an abandoned truck when the train was in the area of the whistle board, or about 1,320 feet west of the crossing. Other than Mr. Scott's own assertion that he was able to see a dump truck[3] on the crossing from 3,000 feet away, he has offered no basis for his opinion that the crew should have seen Ms. Duran's truck any earlier than Engineer Ray has said he was able to observe it, and consequently applied the brakes at that point.

Again, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702 advisory committee's note. Mr. Scott has not testified that he has been involved in a situation akin to the one that existed on November 1, 2006, and the Court

---

[3] Again, the truck placed on the crossing during Mr. Scott's site visit was white, whereas Md. Duran's dump truck was blue and black in color.

concludes that his experience during his site inspection (*i.e.*, his observation of a white dump truck from a position on the ground 3,000 feet away from it) does not provide a sufficient basis for his opinion as to what Engineer Ray and Conductor Owens should similarly have seen from that distance (or from 2,000 feet or from 4,000 feet).  Additionally, what Mr. Scott says he saw (a white truck on the crossing) from his position on the ground is unlikely to be of assistance to the jury, which will be charged with determining what Mr. Ray and Mr. Owens should have seen of a blue and black truck, as they approached it from the cab of an eastbound train moving at approximately 64 or 65 miles per hour and toward a rising sun.

Accordingly, to the extent that Mr. Scott would testify that the crew members should have taken emergency measures when it became clear to them that Ms. Duran's truck was not going to move, such an opinion is relevant; it is reliable inasmuch as it is based on an accurate understanding of the law; and it is likely to assist the jury.  However, to the extent that Mr. Scott proposes to testify that the crew should have seen Ms. Duran's truck from a distance of 2,000; 3,000; or 4,000 feet west of the crossing, such testimony is not reliable nor it is likely to assist the jury; such testimony therefore will not be permitted.  Consequently, BNSF's motion is granted in part and denied in part on this point.

### f. Opinion About How Much the Train Would Have Slowed in 2,000 Feet of Full Service Braking

In this section of its motion, BNSF seeks to preclude Mr. Scott's proposed testimony that "had the train been placed in full service braking (this is not emergency braking), its speed would have been reduced from 65 mph to 40-45 mph within 2,000 feet from the point

of full service braking." [Doc. 497 at 11].

Through his deposition, Mr. Scott testified that he applied the following formula in reaching his conclusion:

> I used the length of the train, which was reported to be 7,781 feet, and then air travels in the brake pipe at a service rate of approximately 600 feet per second. So you just divide 600 into the length of the train. 600 equals—and that is 12.9 seconds, or I'd call it 13. I rounded it to 13 seconds. So that is for the signal to get all the way to the rear of the train.

> We got to remember, now, we're getting brakes on the front end of the train progressively to the rear as the brakes are applying throughout the train, so we're already starting to slow. And, then, for that particular train, I would give it another—I think I gave—I didn't write that down but I believe it was between five and eight seconds, I think, for full buildup to the rear. And then the slowing process from there, and that is where the numbers come from.

[Doc. 497; Exh. A-1; Scott depo. at 122-123]. He then explained that his calculations were not based on mechanical considerations but, rather, on his "training and experience on air brakes, which [he] taught for many years[,]" as well as his "hav[ing] run thousands of simulations on trains similar to this. . . ." [Id.; Exh. A-1; Scott depo. at 124].

Through his deposition, Mr. Scott testified that he is not trained in physics, is not a traffic engineer, and is not a mathematician. However, he stated the belief that he *is* an expert in the braking and stopping distances of trains. [Doc. 497; Exh. A-1; Scott depo. at 69-71]. Still, when asked if he recognized that a formula is required to compute exact stopping distances, Mr. Scott replied that a calculation known as the Davis formula exists and can be used, but that train simulators now are used and "are much more accurate." [Id.; Exh. A-1;

Scott depo. at 72].  He also testified that he has not published or presented on the topic of train stopping distances, and that he "perhaps" had testified in the past that the use of the Davis formula is for mathematicians.  [Id.; Exh. A-1; Scott depo. at 73].

As discussed above, Mr. Scott clearly possesses education, experience, and training in the area of air braking.  He also knows that one "can . . . still use the Davis formula" to calculate a train's braking and stopping distance.   [Doc. 497; Exh. A-1; Scott depo. at 72].  Although Mr. Scott admittedly did not apply the Davis formula here (applying instead his own "training and experience"), he testified that he "know[s] how to do it."  While Mr. Scott testified that "lots of variables" come into play in calculating stopping distance, he did not elaborate on those variables, explaining instead that "you don't need to know that" because train simulators are now used and they "are much more accurate."  [Id.; Exh. A-1; Scott depo. at 71-72; compare Doc. 564; Exh, F, calculations of Foster Peterson (demonstrating that stopping distance is calculated by considering, among other factors, speed; train weight; car and locomotive weight; brake cylinder pressure; and grade force)].

The Court concludes that Mr. Scott's proposed testimony on how much the train in this case would have slowed in 2,000 feet of full service braking is not reliable because the end numbers do not appear to have been reached on the basis of the application of a reliable methodology.  For this reason, this proposed testimony will be excluded and BNSF's motion will be granted on this point.

However, should Mr. Scott demonstrate an ability to apply the Davis formula, and should he calculate the train's braking distance through application of the Davis formula,

which he stated he "know[s] how to do[,]" then the Court will reconsider its exclusion of Mr.

Scott's testimony.

### g. Opinions Concerning Supposed Violation of 49 C.F.R. 234.105, 107—"Activation Failure"

In Mr. Scott's opinion, the crew failed "to blow the proper horn signal" upon approach

to the crossing at which Ms. Duran and Mr. Valencia were struck, and this failure amounted

to a violation of 49 C.F.R. § 234.105[4] and 107.[5]   [See Doc. 497; Exh. A-1, Scott depo. at

153].  BNSF has moved to preclude any such testimony from Mr. Scott.

"Activation failure" is defined, in pertinent part, as "the failure of an *active*

highway-rail grade crossing warning system to indicate the approach of a train at least 20

seconds prior to the train's arrival at the crossing. . . ."  49 C.F.R. § 234.5 (emphasis added).

 It is undisputed—and this Court has already held as a matter of law—that the crossing at

which Ms. Duran and Mr. Valencia were struck was equipped with a passive warning

system. [See Doc. 503 at 25-28].  This Court also specifically held that "49 C.F.R. § 234.105

has no application here. . . ." [Id. at 28].  Accordingly, any testimony that Mr. Scott might

---

[4]  That subsection is titled "Activation failure" and provides, in pertinent part, that "[u]pon receipt of a credible report of warning system malfunction involving an activation failure, a railroad having maintenance responsibility for the warning system shall promptly initiate efforts to warn highway users and railroad employees at the subject crossing by taking the [actions described in this subsection]."  49 C.F.R. § 105.

[5]  That subsection is titled "False activation" and provides, in pertinent part, that "[u]pon receipt of a credible report of a false activation, a railroad having maintenance responsibility for

the highway-rail grade crossing warning system shall promptly initiate efforts to warn highway users and railroad employees at the crossing by taking the [actions described in this subsection]." 49 C.F.R. § 107.

provide that the crew violated 49 C.F.R. as a result of failing to "to blow the proper horn signal" would not be relevant and, thus, would not be helpful to the jury.  For this reason, BNSF's motion will be granted on this point.

### h. Public Versus Private Crossing

BNSF seeks to exclude any testimony that Mr. Scott might give as to whether the crossing at issue was a public or private crossing, on the ground that deposing counsel was "unable to obtain a straight answer" as to Mr. Scott's opinion. [Doc. 497 at 14].  The Duran parties do not appear to oppose BNSF's challenge, explaining that "[u]ltimately the Court will make the judicial determination of this issue, and Mr. Scott will render testimony consistent with this Court's ruling." [Doc. 532 at 15].  The Court will grant BNSF's motion on this point as unopposed.

### i. Opinions that Characterize Crew Member's Testimony

BNSF next seeks to exclude what it terms Mr. Scott's characterization of Marlin Ray's deposition testimony that on the morning of the collision, "it was slumber, more or less." [Doc. 497 at 14-16; see also Doc. 360; Exh. 2, Ray depo. at 182].  According to BNSF, Mr. Scott interprets this statement as meaning that "Mr. Ray . . . testified that Conductor Owens was 'sleeping, mostly.'" [Doc. 497 at 15 (*quoting* Exh. A-2, Scott depo. at 174)].

Engineer Ray has been listed as a witness that BNSF "will call or have available at trial. . . ." [See Doc. 592 "Pretrial Order" at 62].  Because Engineer Ray will be available for both direct and cross-examination, it is not necessary that Mr. Scott interpret for the jury what he believes Mr. Ray meant when he testified in his deposition that "it was slumber,

more or less."  To the contrary, Mr. Ray's own trial testimony will be the best evidence of what he intended by his use of the term "slumber."   Mr. Scott's interpretation is not necessary, nor is it likely to assist the jury.

Additionally, when asked the basis for his conclusion that Conductor Owens was "sleeping, mostly," Mr. Scott offered only Engineer Ray's testimony and his own "experience from what [he] knows about railroaders . . . [t]hat early in the morning you got to watch your conductor or he'll sleep on you." [Doc. 497; Exh. A-2, Scott depo. at 174-175.

Once again, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed.R.Evid. 702 advisory committee's note.  In this case, while Mr. Scott's experience might lead him to believe that "early in the morning you got to watch your conductor or he'll sleep on you[,]" he has not testified as to specific times that this has happened to him, nor has he explained how any such experience reliably applies to the facts of this case.  Because the Court does not determine that Mr. Scott's testimony on this matter would be of assistance to the jury, BNSF's motion will be granted on this point.[6]

---

[6]  In his report, Mr. Scott stated the opinion that the train crew, for whom he believes it was "slumber time," violated Rule 1.1.2 of the General Code of Operating Rules, which requires train employees to be alert and attentive while performing their duties. [See Doc. 532; Exh. D, Scott report at 2].

To the extent that evidence is presented that Engineer Ray or other crew members were asleep in the moments heading up to the collision, and Mr. Scott intends to testify that such circumstance would prevent the crew from remaining alert or attentive, as prescribed by the General Code of Operating Rules, such testimony must be excluded.

**j. Opinion Regarding Changes in Dynamic Braking Immediately Before and After Impact**

Mr. Scott has stated in his report that

> Engineer Ray exhibited some strange train handling procedures in the 13 to 14 second period prior to impact. According to the event recorder, at approximately 14 seconds prior to impact, he went from full dynamic brake (#8) down to position #6 in the next second then to set up (no brake) in the next second. He remained in the set-up position for the next 6 seconds, and then went back to full dynamic (#8) up to the point of impact. He remained in full dynamic for the next 3 seconds past impact, then returned to set-up position for the remainder of the stop. This erratic behavior did not help the slowing or stopping process.

[Doc. 532; Exh. D, Scott report at 3]. BNSF seeks to preclude Mr. Scott from testifying as to the changes in dynamic braking immediately before and after impact on the ground that such testimony is not relevant. [See Doc. 497 at 17].

It is not disputed that Mr. Scott is a licensed locomotive engineer. Nor is it disputed that, during his time with CSX, Mr. Scott supervised "all transportation employees in train operation." [Doc. 532; Exh. B, Scott resume at 1]. Finally, Mr. Scott has received specialized training in the proper use and downloading of data from locomotive event recorders. [Id.; Exh. B, Scott resume at 3]. In this case, Mr. Scott has applied his knowledge of and experience in interpreting data from locomotive event recorders in reviewing the

---

Obviously should the jury be presented with evidence that the crew were asleep immediately prior to the collision, it would not require the expertise of Mr. Scott to draw the jurors' attention to the fact that such circumstance would necessarily affect one's ability to be alert or attentive. This is something the jurors can assess for themselves. The Court thus finds that such testimony from Mr. Scott would not assist the jury.

information that was registered on the locomotive event recorder recovered from the train in this matter.  On the basis of this review, Mr. Scott has formed the opinion that "Engineer Ray exhibited some Engineer Ray exhibited some strange train handling procedures in the 13 to 14 second period prior to impact."  Mr. Scott is qualified to offer this opinion, which is certainly relevant.  It also is reliable, as it is based on Mr. Scott's application of his specialized training to his review of materials made available to him in this case.  His opinion also would be helpful to the jury, as it is stems from his technical and specialized knowledge of locomotive event recorders, as well as his experience as a supervisor of train-operations employees.  Mr. Scott will be permitted to offer this testimony; BNSF's motion will be denied on this point.[7]

### k. Opinions Regarding BNSF's Alleged Failure to Discipline After the Accident

BNSF next seeks to prevent Mr. Scott from "opin[ing] that BNSF should have disciplined the crew for not going to full service braking at 4,000 feet, not applying the emergency brake at 2,000 feet, and not blowing the staccato horn pattern from 2,000 feet." [Doc. 497 at 17].  Because Mr. Scott's proposed opinions with respect to the full service braking and the emergency braking are premised on his belief that the crew should have seen

---

[7]  To the extent that BNSF seeks to prevent Mr. Scott from testifying that a greater brake application would have led to a shorter stopping distance which, in turn, "makes a difference [because] if you stop shorter, you have a shorter distance to walk back to the crossing, so you can break the crossing and let emergency vehicles in[,]" [see Doc. 497; Exh. A-2, Scott depo. at 192], such testimony, BNSF's motion will be granted.  Such testimony is not relevant, as there has been no allegation that Ms. Duran and Mr. Valencia died as a result of being deprived of emergency care. [See Doc. 497 at 17].

Ms. Duran's truck from those distances, and Mr. Scott, as discussed above in Section II.2.e., will not be permitted to offer those predicate opinions, his testimony that BNSF should have disciplined the crew for failing to apply brakes at those distances likewise will not be permitted.

The belief that BNSF should have disciplined the crew for failing to blow the staccato horn pattern similarly is based on a predicate opinion that this Court has already determined, as set forth more fully above in Section II.2.b, will not be permitted.  Accordingly, Mr. Scott will not be allowed to offer his opinion that BNSF should have disciplined the crew for not blowing a staccato horn pattern.

Finally, it appears that the sole basis for Mr. Scott's opinion that BNSF should have disciplined Engineer Ray and Conductor Owens for their actions on the morning of November 1, 2006 is experiential, inasmuch as he explains: "As a former officer for CSX for many years, I made sure my backyard was clean before I pointed my finger at someone else." [Doc. 532; Exh. D, Scott report at 3].  While the precise meaning of this statement is not entirely clear to the Court, it appears to be a suggestion that BNSF comes to this matter with unclean hands.  Mr. Scott has not explained how any experience he may have had supports his personal experience that BNSF appears here with unclean hands.  See Fed.R.Evid. 702 advisory committee's note.  Moreover, the Court concludes that this suggestion or opinion has little, if any, probative value.

BNSF also seeks to preclude Mr. Scott from mentioning that Conductor Owens and an engineer other than Engineer Ray were disciplined in 2005 for failing to sound their

23

train's horn for the required amount of time at a public crossing. [Doc. 497 at 19; see also

Exh. D; Scott report at 3]. BNSF seeks to preclude such testimony on the ground that it is

being offered to demonstrate that on November 1, 2006, Conductor Owens acted in

conformity with this "prior bad act." [Doc. 497 at 19].

  Rule 404(b) of the Federal Rules of Evidence provides, in pertinent part, that

> [e]vidence of other crimes, wrongs, or acts is not admissible to
> prove the character of a person in order to show action in
> conformity therewith. It may, however, be admissible for other
> purposes, such as proof of motive, opportunity, intent,
> preparation, plan, knowledge, identity, or absence of mistake or
> accident . . . .

Fed.R.Evid. 404(b). Additionally, "Fed.R.Evid. 404(b) applies to civil, as well as criminal

cases." Orjias v. Stevenson, 31 F.3d 995, 1000 (10th Cir. 1994). In this case, however, the

Duran parties have not indicated for what proper purpose they are offering evidence of

Conductor Owens' previous discipline. [See Doc. 532 at 18]. While they appear to offer this

evidence to demonstrate a pattern by BNSF of failing to discipline its crews, they make the

somewhat contradictory argument that they "strongly dispute[] that BNSF does not

encourage its train crew members to violate its rules by not disciplining them when they do[,

as] Conductor Owens had a prior incident of being in charge of a train that failed to blow the

proper horn signal for a grade crossing." [Doc. 532 at 18].

  As a result of this prior incident, Conductor Owens actually was subjected to a process

BNSF calls "alternative handling," which Larry Kreger, BNSF's Superintendent of Operating

Practices, has described as an effort by BNSF and railroad unions "to move away from the

standard discipline and come up with a way to work with employees to change behaviors. . . ." [Doc. 414; Exh. 9, Kreger depo. at 12].[8]

Among other determinations it must make when assessing the admissibility of evidence offered under rule 404(b), the Court "must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice. . . ." United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000).  In this case, the Court determines that the minimally probative value of evidence of Conductor Owens' previous discipline is substantially outweighed by its potential for unfair prejudice, specifically that the jury will conclude that on November 1, 2006 Conductor Owens was merely acting in conformity with his "prior bad act" of 2005.  Accordingly, BNSF's motion will be granted on this point.

### l. Opinions that BNSF and its Crew Acted Willfully, Recklessly, and with Utter Disregard for the Safety of Others

Mr. Scott's report concludes with his opinion that "the failures of [E]ngineer Ray and [C]onductor Owens were negligent, willful, reckless and with utter disregard for the safety of others including Ms. Duran and Mr. Valencia." [Doc. 532; Exh. D, Scott report at 4]. BNSF seeks to exclude Mr. Scott's proposed testimony "that BNSF and the crew acted willfully, recklessly, and with utter disregard for the safety of others." [Doc. 497 at 20].  The Duran parties respond that the proffered testimony is permitted by Fed.R.Evid. 704, which "explicitly states that 'testimony in the form of an opinion or inference otherwise admissible

---

[8]  Mr. Scott has also stated that he believes that Conductor Owens was properly disciplined for the prior incident. [See Doc. 497; Exh. A-2, Scott depo. at 172].

is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'"

[Doc. 532 at 19 (*quoting* Fed.REvid. 704)].

Rule 704 "permits a witness to testify about an ultimate issue of *fact*. . . ." United

States v. Oles, 994 F.2d 1519, 1523 (10th Cir. 1993).  What Mr. Scott proposes to testify to,

however, embraces an ultimate issue of *law*, expert testimony on which is disfavored because

while "testimony on the ultimate factual questions aids the jury in reaching a verdict[,]

testimony which articulates and applies the relevant law . . . circumvents the jury's

decision-making function by telling it how to decide the case." Specht v. Jensen, 853 F.2d

805, 808 (10th Cir. 1988).  To be sure, the Tenth Circuit has described permitting expert

testimony on "ultimate principles of law governing the deliberations of the jury . . . as

directing a verdict." Id.; see also Hadley v. Volunteers of Am. Care Facilities, 2008 WL

269446, at *5 n.3 (D.Colo. 2008) (excluding proposed expert's legal conclusions as to

reckless and wanton conduct, "as they [were] not an appropriate subject for expert

testimony[,]" and further noting "[t]hese standards apply to expert reports.")].[9]

"Generally, an expert may not state his or her opinion as to legal standards nor may

he . . . state legal conclusions drawn by applying the law to the facts." Okland Oil Co. v.

Conoco Inc., 144 F.3d 1308, 1328 (10th Cir. 1998).  For this reason, Mr. Scott will not be

---

[9] After briefing was complete on *BNSF's Fifth Motion in Limine*, the Court entered an *Order* granting *BNSF's Motion Dismissing Punitive Damages Claims* [Doc. 639].  As the claims for punitive damages have been dismissed, Mr. Scott's testimony on alleged willful and wanton conduct, and utter disregard for safety, would appear to be irrelevant. See Hadley, 2008 WL 269446, at *4 (noting that "'willful and wanton misconduct[]' . . . is not a separate tort, but rather the requisite level of misconduct required in order to recover exemplary damages.").

permitted to testify to his opinion that, in this case, BNSF and the train crew acted willfully, recklessly, and with utter disregard for the safety of others. [See Doc. 497 at 20].  BNSF's motion will be granted on this point.

## III. CONCLUSION

For the reasons stated more fully herein, *Plaintiff BNSF Railway Company's Fifth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Jimmy Scott, Pursuant to the Federal Rules of Evidence and Daubert* will be granted in part and denied in part.  As always, these pretrial evidentiary rulings are subject to reconsideration in the event that unforeseen circumstances or a change in context should arise during the trial.

**IT IS, THEREFORE, ORDERED** that *Plaintiff BNSF Railway Company's Fifth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Jimmy Scott, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 497] is **GRANTED in PART and DENIED in PART**;

**IT IS FURTHER ORDERED** that *Plaintiff BNSF Railway Company's Fifth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Jimmy Scott, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 497] is **DENIED** to the extent that Mr. Scott intends to testify that the crew members should have taken emergency measures when it became clear to them that Ms. Duran's truck was not going to move from the tracks**;**

**IT IS FURTHER ORDERED** that *Plaintiff BNSF Railway Company's Fifth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Jimmy Scott,*

27

*Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 497] is **DENIED** to the extent that Mr. Scott intends to testify as to the changes in dynamic braking immediately before and after impact;

**IT IS FURTHER ORDERED** that *Plaintiff BNSF Railway Company's Fifth Motion in Limine, to Exclude Certain Testimony and Opinions of Claimants' Expert Jimmy Scott, Pursuant to the Federal Rules of Evidence and Daubert* [Doc. 497] is otherwise **GRANTED**.

**SO ORDERED** this 15th day of February, 2009, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge