**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

BNSF RAILWAY COMPANY,

      Plaintiff,                                  CIVIL NO. 06-1076 MCA/LFG

vs.

LAFARGE SOUTHWEST, INC.; STELLA
R. VALENCIA, Personal Representative of the
Estate of Robert J. Valencia; and GREGORY
MARTINEZ and DARLENE COLEMAN,
Personal Representatives of the Estate of
Carol E. Duran,

      Defendants.
========================================

STELLA R. VALENCIA, individually, and as
Personal Representative of the Estate of Robert J.
Valencia, JOHN KELLY VALENCIA, DESIREE
RICHELLE VALENCIA, STEPHANIE ESTELLE
VALENCIA, and LILLIAN S. VALENCIA,

      Counter Claimants/Cross-Claimants/
      Third-Party Plaintiffs,

vs.

BNSF RAILWAY COMPANY, and DARLENE
COLEMAN, Personal Representative of the
Estate of Carol E. Duran,

      Counter-Defendants/Cross-Defendants,

MIKE TAFT, d/b/a Taft Construction;
and EL PASO NATURAL GAS COMPANY

      Third-Party Defendants.
========================================

LAFARGE SOUTHWEST, INC.

    Third-Party Plaintiff/Cross-Plaintiff

vs.

DARLENE COLEMAN, individually, and as Personal Representative of the Estate of Carol E. Duran; GREG GUTIERREZ and MATTHEW RAY DURAN, individually,

    Plaintiffs,

vs.

BNSF RAILWAY COMPANY; LAFARGE SOUTHWEST, INC.; STELLA VALENCIA, Personal Representative of the Estate of Robert J. Valencia; MIKE TAFT, d/b/a Taft Construction; and EL PASO NATURAL GAS CO.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Lafarge's Motion to Alter/Amend Memorandum and Order [Doc. 656]* [Doc. 668], filed February 10, 2009. BNSF filed a response on February 16, 2009. [See Doc. 716]. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies the motion.

## I. BACKGROUND

This action arises from a fatal collision between an eastbound freight train operated by Plaintiff BNSF Railway Company and a commercial dump truck that was being driven

2

by decedent Carol Duran.  On November 1, 2006, Ms. Duran, a contractor for Defendant/Third-Party Plaintiff Lafarge Southwest, Inc., was delivering gravel to a construction site near the railroad tracks when, at the apparent direction of her supervisor, Lafarge employee and decedent Robert Valencia, she stopped her truck on a crossing on the tracks in order to speak with him.  Both Ms. Duran and Mr. Valencia were killed as a result of the train colliding with Ms. Duran's fully loaded truck.

An autopsy was performed on Mr. Valencia, and the Scientific Laboratory Division of the Office of the Medical Investigator (OMI) issued a subsequent toxicology report.  That report revealed that Delta-9-Tetrahydrocannabinol (THC), the principal psychoactive constituent of marijuana, was found in an amount of 23 ng/ml in a sample of Mr. Valencia's pleural blood, and that 11-Nor-9-Carboxy-Delta-9-Tetrahydrocannabinol (Carboxy-THC), a metabolite of THC that is the major psychoactive constituent of marijuana, was found in an amount of 12 ng/ml. [See Doc. 491; Exh. 1, Valencia Toxicology Report at 1].

On October 21, 2008, BNSF filed *BNSF Railway Company's First Motion in Limine, to Exclude the Opinions of Dr. Steven B. Karch as Inadmissible Under the Rules of Evidence and Daubert* [Doc. 491], by which BNSF sought, among other things, to prevent Dr. Steven Karch from offering his expert opinions that (1) "there is no reliable scientific support for extrapolation of ante-mortem levels of THC in a person's body via post-mortem analysis," [see Doc. 500 at 4, 8], and (2) "it cannot be determined from the toxicology evidence whether Mr. Valencia had smoked marijuana at any time prior to the accident or was impaired at the time of the accident. . . ." [see Doc. 491 at 4-5].  Dr. Karch's opinions in this

3

regard were based on his disagreement with studies demonstrating that time of last cannabis use can be estimated through application of scientific models ("the Huestis models") to an individual's plasma THC and Carboxy-THC concentrations.

The Huestis models, named for Dr. Marilyn Huestis of the Intramural Research Program on Chemistry and Drug Metabolism of the National Institutes of Health National Institute on Drug Abuse, demonstrate that the ratio of THC to its metabolite can be plotted over time, resulting in a predictive formula for time of last cannabis use to within 95% confidence intervals. [Doc. 491; Exh. 3, "Estimating the Time of Last Cannabis Use" at 2290]. Additionally, "[s]cientists in North America, Europe, Australia, and Canada have applied these predictive models in forensic and medical situations in which it was important to estimate the time of last cannabis use." [Id.].

Through his deposition, Dr. Karch testified that Dr. Huestis is "absolutely" an expert in her field and "arguably America's leading research clinical toxicologist in abused drugs." [Doc. 491; Exh. 2, Karch depo. at 36, 115]. He stated, however, that while Dr. Huestis and peer reviewers "believe[] . . . entirely" in the validity of Model II to determine THC levels from postmortem blood; Dr. Karch "just happen[ed] to think they are wrong." [Id.; Exh. 2, Karch depo. at 116].

At the December 18, 2008 pretrial conference in this matter, the Court questioned the parties about the need for evidentiary hearings on the outstanding motions in limine,

4

including BNSF's motion to exclude Dr. Karch's opinions. Counsel for the Valencia parties[1] advised the Court that "the issue ha[d] been fully briefed and an evidentiary hearing [was] not necessary." [Doc. 626 at 37]. Thereafter, by *Memorandum Opinion and Order* entered February 3, 2009, this Court granted BNSF's motion to exclude Dr. Karch's opinion that there is no reliable scientific support for extrapolation of ante-mortem levels of THC in a person's body via post-mortem analysis. Critical to the Court's conclusion was that Dr. Karch had offered no scientific basis for his disagreement with the Huestis models; therefore, the Valencia parties had not satisfied their burden of establishing the reliability of Dr. Karch's opinion in this regard. [See Doc. 656 at 12; see also Doc. 491; Exh. 2, Karch depo. at 116 (where Dr. Karch stated that while Dr. Huestis and peer reviewers "believe[] . . . entirely" in the validity of Model II to determine THC levels from postmortem blood; Dr. Karch "just happen[ed] to think they are wrong.")].

On February 10, 2009, Lafarge filed *Lafarge's Motion to Alter/Amend Memorandum and Order* [Doc. 656], [Doc. 668], arguing that Dr. Karch's proffered opinion is necessary to defend against that of Dr. Don Fisher, BNSF's expert witness in the area of toxicology,

> "that 'to a reasonable degree of medical and scientific probability, Mr. Valencia consumed marijuana within one hour of the accident and was impaired by the use of marijuana at the time of the accident . . . and that 'the level of impairment corresponded to the blood level of marijuana found in his system at the time of his death.'"

---

[1] Although Dr. Karch was retained as an expert by Lafarge, the Valencia parties wrote the response to BNSF's motion to exclude his opinions, a response in which Lafarge joined. [See Doc. 535].

[Doc. 668 at 5 (*quoting* Doc. 500; Exh. 8, Karch report at 5]. Lafarge also asserts that

> Dr. Karch's area of expertise—post mortem redistribution—stands for the proposition that levels of drugs detected in a cadaver can appear to be present in the body in higher or lower concentrations than were actually present in the body in life, because of the manner in which drugs redistribute at and after death. And without corroborative data on when marijuana was ingested, postmortem information is not a reliable predictor of impairment. This proposition is well documented to be the prevailing opinion of the scientific community.

[Id.]. Finally, Lafarge contends that if the Court were to grant its motion, Dr. Karch would testify as to "the well accepted principles of postmortem redistribution generally. . . ." [Id. at 8].

## II. ANALYSIS

The Federal Rules of Civil Procedure do not expressly recognize motions for "reconsideration." Instead, depending on when the motion is filed, it is treated either as a Rule 59(e)[2] motion to alter or amend the judgment or a Rule 60(b)[3] motion for relief from the judgment. Computerized Thermal Imaging, Inc. 312 F.3d 1292, 1296 n.3 (10th Cir. 2002). In this case, because Lafarge filed its motion on February 10, 2009, within ten days from the February 3, 2009 entry on the docket of the challenged *Memorandum Order and*

---

[2] A motion filed within ten days of the district court's entry of judgment is treated as a motion to alter or amend the judgment under Rule 59(e). Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).

[3] A motion filed more than ten days after entry of judgment is treated as a motion for relief from judgment under Rule 60(b). Computerized Thermal Imaging, Inc., 312 F.3d at 1296 n.3.

*Opinion*, its motion is treated as having been brought pursuant to Rule 59(e).  See id.; see also Fed.R.Civ.P. 6(a) (explaining computation of time periods under Rules).

"A motion for reconsideration is an extreme remedy to be granted in rare circumstances."  Brumark Corp. v. Samson Resources Corp., 57 F.3d 941, 944 (10th Cir. 1995).  The decision to grant reconsideration is committed to the sound discretion of the district court, which, in exercising that discretion, considers whether there (1) has been an intervening change in the law, (2) exists new evidence, or (3) is the need to correct clear error or to prevent manifest injustice.  Id.  Thus, a motion for reconsideration may be appropriate where the court has misapprehended the facts, a party's position, or the controlling law.  Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).

On the other hand,

> [a] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple. Further, the moving party must show more than mere disagreement with the court's decision and recapitulation of the cases and arguments considered by the court before rendering its original decision. A motion for reconsideration will only be granted if the moving party has provided the court with dispositive factual matters or controlling decisions of law which were overlooked. . . . [A] motion for reconsideration is an extraordinary remedy that should be used sparingly and limited to exceptional circumstances.

Van Haste v. Coram Healthcare Corp., 2008 WL 2943370, at *1 (D.N.J. July 29, 2008) (*quoting* In re NJ Affordable Homes Corp., 2006 Bankr. LEXIS 1667, *9-*11 (Bankr.D.N.J. July 19, 2006)) (denying motion to reconsider order denying plaintiff's request for extension of time to serve affirmative expert reports, notwithstanding plaintiff's assertion that denial

7

of the motion would "unfairly den[y plaintiff] the opportunity to provide expert testimony at the trial establishing the Defendant's disclosure requirements.").

As an initial matter, the Court notes that Dr. Karch testified through his deposition that he (1) was "absolutely not" opining that Mr. Valencia was not impaired; (2) is "not an expert on impairment[, which] would be testifying beyond [his] training[;]" and (3) believes that the "general consensus" is that cannabis-impaired drivers make more errors in judgment than those not under the influence, but explained that that was neither his "field" nor "really of interest to [him]." [Doc. 491; Exh. 2 at 12, 44, 94]. Thus, to the extent that Lafarge here suggests that Dr. Karch should be permitted to offer testimony *on the issue of impairment* (in addition to offering testimony on the issue of post-mortem redistribution) in an effort to counter Dr. Fisher's testimony that Mr. Valencia was impaired at the time of the collision, Dr. Karch is not qualified to offer any such an opinion and any such opinion would not be allowed.

In this case it is undisputed that the post-autopsy toxicology report issued by the OMI revealed the presence in Mr. Valencia's sampled pleural blood of THC and Carboxy-THC at the levels set forth above (23 ng/ml and 12 ng/ml, respectively). Thus, the *precise* issue here is one involving postmortem levels of THC and Carboxy-THC. No other drugs or illegal substances are relevant. However, other than describing himself as "an expert in heart disease and cannabis[,]" [see Doc. 491; Exh. 2, Karch depo. at 94], Dr. Karch actually demonstrated little experience with or knowledge of what THC does in a postmortem body.

For example, through his deposition, Dr. Karch testified that, while he had unsuccessfully attempted 20 years ago to "figure out . . . time of death by measuring . . . cocaine to cocaine metabolite[,]" he had conducted no independent research to determine what happens to THC levels in postmortem blood. [Doc. 491; Exh. 2, Karch depo. at 47, 116]. When asked specifically about his own independent research on the relationship between antemortem and postmortem levels of THC, Dr. Karch said:

> I do know . . . drugs change concentrations, and I know why they change concentrations. And *I don't have any reason to say that THC is exactly the same as cocaine. It has certain physical properties that make the changes that occur with other drugs very likely, but it has not been proven.*

[Id.; Exh. 2, Karch depo. at 47 (emphasis added)]. Dr. Karch also referred to a study wherein a Miami toxicologist and his graduate students "dr[o]ve right to the hospital" after a body came in "to see if they could get any blood before it was thrown away. *And they studied three or four drugs, not—not marijuana*. And they found that they all went up." [Id.; Exh. 2, Karch depo. at 73-74 (emphasis added)]. According to Dr. Karch, he "would expect" postmortem THC levels always to be higher than antemortem levels, but he could not prove that that is the case because he "ha[d] not done the experiment." [Id.; Exh. 2, Karch depo. at 70]. Finally, Dr. Karch testified to "a wonderful paper" that discusses the complexities in extrapolating postmortem drug concentrations to concentrations at time of death, noting, however, that that paper "*is about cocaine*." [Id.; Exh. 2, Karch depo. at 72 (emphasis added)].

9

Lafarge has attached a number of scientific articles to its motion to alter or amend, but the Court concludes that these articles are not of much assistance, as they either address postmortem redistribution of drugs and/or substances *other than* THC or, if they address THC, do not discuss its postmortem redistribution. [See Doc. 668; attached articles]. To be sure, there does not appear to be a real dispute in this case that postmortem redistribution can generally occur. Indeed, both Dr. Fisher and Dr. Scott Phillips, a cross-designated medical expert for BNSF, appeared to accept that postmortem redistribution can certainly occur, yet also testified, for reasons they explained during their depositions, that "postmortem distribution of marijuana [was] unlikely to be significant in this case[,]" (Dr. Fisher), and that "[i]f [postmortem distribution] was a factor . . . it would [not have been] a substantial factor[,]" (Dr. Phillips). [See Doc. 363; Exh. D at 2; Doc. 516; Exh. 1, Phillips depo. at 41-42]. Again, the reason for the exclusion of Dr. Karch's proffered testimony is that he offered no scientific basis for his opinion that postmortem levels of THC *specifically* do not relate to antemortem levels. [See Doc. 656 at 12]. Lafarge has not shown cause to disturb the Court's original ruling on this issue.

## III. CONCLUSION

Because Lafarge has not demonstrated that there (1) has been an intervening change in the law, (2) exists new evidence, or (3) is the need to correct clear error or to prevent manifest injustice, its motion to alter or amend will be denied. See Brumark Corp., 57 F.3d at 944; cf. Van Haste, 2008 WL 2943370, at *1.

**IT IS, THEREFORE, ORDERED** that *Lafarge's Motion to Alter/Amend Memorandum and Order [Doc. 656]* [Doc. 668] is **DENIED**.

**SO ORDERED** this 20th day of February, 2009, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge